Tonya E. **LAPSLEY,** Plaintiff,

v.

**COLUMBIA UNIVERSITY–COLLEGE OF PHYSICIANS AND SURGEONS,** Defendant.

**No. 96 Civ. 2686(DC).**

United States District Court, S.D. New York.

March 26, 1998.

Charles M. Powell & Associates, by Charles M. Powell, New York City, for Plaintiff.

Shoeman, Marsh & Updike, LLP, by Charles B. Updike, Laura D. Barbieri, New York City, for Defendant.

## OPINION

CHIN, District Judge.

In this Title VII case, plaintiff Tonya E. Lapsley contends that her former employer, The Trustees of Columbia University in the City of New York (sued herein as "Columbia University-College of Physicians and Surgeons" but hereinafter referred to as "Columbia"), discriminated against her because of her race in virtually every aspect of her employment—from salary increases and bonuses to job reclassification and the use of cell phones to termination and severance benefits. Lapsley also alleges that Columbia subjected her to unlawful retaliation and intentional infliction of emotional distress. Columbia denies the allegations and moves for summary judgment dismissing plaintiff's claims.

■■■ The "ultimate issue" in any employment discrimination case is whether the adverse employment decision was motivated at least in part by an "impermissible reason," *i.e.*, a discriminatory or retaliatory reason. In the summary judgment context, the issue is whether the plaintiff has presented sufficient evidence to raise a genuine issue of fact as to whether an impermissible reason played a determinative role in the adverse decision.

In the instant case, despite the breadth of her allegations and her scattershot approach, Lapsley has not come forward with "concrete particulars" to show that a trial is needed on the issue of whether an impermissible reason affected Columbia's employment decisions. Instead, at the end of the day, plaintiff has failed to provide sufficient evidence from which a reasonable jury could conclude that she was discriminated against because of her race or that she was retaliated against for engaging in protected activity or that she was subjected to intentional infliction of emotional distress. Indeed, viewing the evidence in the light most favorable to plaintiff, I hold that the record does not present triable issues of fact. Accordingly, the motion for summary judgment is granted and the complaint is dismissed.

## BACKGROUND

### A. *The Facts*

Lapsley is an African-American woman who was hired by Columbia on June 8, 1987 as a Secretary-B, grade level-1, at a salary of $17,044 per year. At the time, she was a high school graduate, and although she had completed some courses at a community college, she did not hold a college degree. (*See* Lapsley Aff. ¶ 40). She had previously worked as a secretary in the General Supplies Department of Albert Einstein Hospital, as a mail carrier for the U.S. Postal Service, and as a Senior Clerk Typist at Montefiore Medical Center. (*See* Def.Ex. D).

Although Lapsley was employed by Columbia, she was assigned by Columbia to work in the Surgery Department at Presbyterian Hospital, a separate but affiliated entity. At all times during her employment with Columbia, Lapsley reported to Craig Evans, the Administrator of the Department of Surgery. (*See* Evans Aff. ¶¶ 4–6; Lapsley Dep. at 112).

At the end of Lapsley's probationary period, her base salary was increased to $18,004. (*See* Pl.Ex. C). On October 1, 1988, largely as a result of Evans's recommendation, Lapsley received a 4% increase in her salary to $18,766. Shortly thereafter, Columbia promoted her to the position of Administrative Aide, a grade level-2 position, and her salary was increased to $23,452. (*See* Lapsley Aff. ¶ 14; Evans Aff. ¶ 15). She received another raise in October of 1988 to $25,366. Hence, in just 16 months, Lapsley received four raises, which increased her salary a total of almost 50%.

At some point a vacancy developed when Evans's Administrative Assistant left. Lapsley's responsibilities continued to expand, and, on or about February 4, 1989, Evans

interviewed her along with a number of other applicants for the vacant position. Evans selected Lapsley for the job, and she was promoted to Administrative Assistant, grade level–3. The promotion brought her salary up to $27,903. (*See* Evans Aff. ¶ 16).

Lapsley continued to excel in her work and Columbia consistently rewarded her strong performance. Eventually, however, Lapsley began to believe that she was being underpaid. She wrote a letter to Evans on January 10, 1991, requesting a 15% increase in her salary for taking on a "tremendous increase in [her] workload" and serving as a "Jack of all trades." (Letter from Lapsley to Evans, Pl.Ex. E).

Rather than simply increasing her salary, Evans determined that it would be more appropriate to promote her. Accordingly, he offered her the position of Administrative Coordinator for Academic Affairs, grade level–4. (*See* Evans. Aff. ¶ 17). On April 15, 1991, after considering other offers of employment with Dr. Keith Reemtsma and Dr. Peter Geller, Lapsley chose to accept the promotion offered by Evans. This increased her salary to $35,034. At Evans's request, she also received a 15% salary increase retroactive to April 15, 1991; she received an additional 6% increase effective July 1, 1991. By the first of July 1991, Lapsley was earning $37,135 a year.

In her new position, Lapsley was "primarily responsible for processing paperwork for persons within the medical center to receive their appointments to the Columbia Faculty and their respective positions within the affiliate hospitals." (*Id.* ¶ 39). Although she had no authority to recommend an employee for a promotion or increase in salary and did not have final approval power, once such a recommendation had been made, Lapsley determined whether the employee was eligible for the requested upgrade. (*See* Lapsley Dep. at 132). She was also charged with assisting Evans with time and attendance reporting, payroll administration, oversight of various payrolls, and preparation of appointment and promotion packages. (*See* Lapsley Aff. ¶ 40). She also assumed certain tasks ordinarily performed by a business manager, such as those related to day-to-day timekeeping for the business office staff.

By memorandum dated October 7, 1991, Lapsley again sought a salary increase on the ground that her salary did not reflect "market values." (Memorandum from Lapsley to Evans, Pl.Ex. E). This request was granted, but only beginning the new academic year.

On January 15, 1992, Evans requested a parity review of Lapsley's salary, stating that it was his "understanding from our department review that adjustments are warranted." (Memorandum from Evans to Glazer, Pl.Ex. H). A campus-wide salary review, however, revealed that Lapsley was "compensated similarly to other Administrative Coordinators performing similar duties," and the Department of Human Resources ("Human Resources") recommended against granting her an off-cycle salary adjustment. (*See* Letter from Glazer to Evans dated February 18, 1992, Def.Ex. H). Notwithstanding the results of this study, Lapsley received a 12% increase, bringing her annual salary to $41,492. By 1995, Lapsley was earning $45,850. Hence, in the first six years of her employment, Lapsley received, largely as a result of Evans's efforts, three promotions and at least 11 pay raises (including increases resulting from the promotions).

In January 1994, Evans allegedly promised Lapsley that her position would be reclassified to grade level–5 and that she be promoted to the new post. That never happened. (*See* Lapsley Dep. at 194–95).

In early 1994, Evans apparently began to become dissatisfied with Lapsley's performance. He spoke to her on more than one occasion about her absences from work and tardiness, although Lapsley denies that she was ever informed orally or in writing of any other "dissatisfactory work performance." (Evans Aff. ¶ 56; Lapsley Aff. ¶ 52). On or about September 21, 1993, she injured herself falling, and went on sick leave until October 13, 1993. Her injuries did not heal quickly enough, however, and after discussions with Evans, she agreed to return to work on a part-time basis. She became ill by food poisoning in January of 1994, and missed work from January 14 until January

20. In May, she was out of the office for three days as a result of injuries to her shoulder. (*See* Lapsley Dep. at 417). The record is not clear as to the exact number of days Lapsley was either late for work or out of the office in 1994.

Eventually, Evans sought advice from Human Resources about his dissatisfaction with Lapsley's performance. He states that nine months prior to Lapsley's dismissal, he had "four or five" conversations with Sybil Williams and Carol Samberg of Human Resources, who informed Evans that he had sufficient grounds to dismiss Lapsley. (Evans Aff. ¶ 57; *see also* Williams Aff. ¶ 7 (stating that she and Evans spoke "a number of times prior to [Lapsley's] termination date" about her work performance, absences, and lateness)). Rather than fire her outright, however, Evans decided to lay her off so she could collect severance pay. (*See* Evans Aff. ¶ 59; Williams Aff. ¶¶ 8–10).

Lapsley was notified on December 22, 1994 that she would be laid off effective January 31, 1995 because of staff reductions. Lapsley was the only member of Evans's staff to be let go at that time. She received a second layoff notice on January 3, 1995 informing her that her position was being phased out due to reorganization needs. On or about January 3, 1995, Lapsley met with Dr. Eric Rose, the new Chairman of the Department, who informed her that her absences in 1994 played a significant role in her layoff. Dr. Rose told her that he had been informed by Evans that she had been absent from work on at least 47 days in 1994.[1] (*See* Lapsley Dep. at 413–15).

Soon thereafter, Evans sought and obtained reclassification of Lapsley's position to Administrative Manager, grade level–5. On or about January 17, 1995, Evans interviewed a number of persons, including an individual who had been laid off by Columbia, and eventually selected Georgina Henriquez, an Hispanic woman, for the job. (*See* Evans Aff. ¶ 58). Lapsley did not apply for the new position.

### B. *Procedural History*

Lapsley filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") on March 22, 1995. On January 19, 1996, the EEOC issued Lapsley a right to sue letter. She filed this suit on April 15, 1996, asserting claims for discrimination on the basis of her race, retaliation, and intentional infliction of emotional distress.

This motion followed.

### DISCUSSION

### A. *Standards*

### 1. *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. Summary judgment may be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there

---

1. Lapsley disputes this number in conclusory fashion, but does not offer what she contends is the correct number of days. (*See* Lapsley Dep. at 415).

is some metaphysical doubt as to the material facts." *Id.* 475 U.S. at 586. The nonmoving party may not rest upon mere "conclusory allegations or denials," but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984)). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249. As the Supreme Court stated in *Anderson,* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

### 2. *Title VII Standards*

The "ultimate issue" in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," *i.e.,* that there was discriminatory intent. *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 119 (2d Cir.1997); *see St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College,* 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc*), *cert. denied,* — U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Plaintiffs have generally sought to meet that burden by using a "mixed-motives" analysis, *see de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 23 (2d Cir.1996); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992), or by proving "pretext" under the three-part test first enunciated by the Supreme Court in *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*See also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *de la Cruz,* 82 F.3d at 20.

As articulated in recent years, the three-step *McDonnell–Douglas* test theoretically operates as follows. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who was qualified for her position (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997). Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden then "shifts" to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Stratton,* 132 F.3d at 879; *Fisher,* 114 F.3d at 1335–36. Third, if the defendant articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's,* 509 U.S. at 510–11. The plaintiff must then show, without the benefit of any presumptions, that it is more likely than not that the employer's decision was motivated at least in part by a discriminatory reason. Because the defendant has at this point offered a nondiscriminatory reason for its actions, the plaintiff must show that the proffered reason is in reality a pretext for unlawful discrimination. *See Fisher,* 114 F.3d at 1337.

Although the *McDonnell–Douglas* framework has been with us for some 25 years, it has proven at times to be confusing and unworkable. The criticisms of this cumbersome burden-shifting mechanism are legion, and courts and commentators have characterized it as a "yo-yo rule,"[2] "befuddl[ing],"[3] "replete with confusion,"[4] and "incomprehen-

---

**2.** *Bickerstaff v. Vassar College,* 992 F.Supp. 372, 373 (S.D.N.Y.1998).

**3.** Kenneth R. Davis, *The Stumbling Three–Step, Burden–Shifting Approach in Employment Discrimination Cases,* 61 Brook.L.Rev. 703, 707–08 (1995) (calling for abandonment of *McDonnell–Douglas* scheme).

**4.** *Shifting Burdens of Proof in Employment Discrimination Litigation,* 109 Harv.L.Rev. 1579, 1602 (1996) (criticizing *St. Mary's* decision for muddying the waters in the "pretext-plus"/"pretext-only" debate).

sible."[5]

As originally conceived, the *McDonnell–Douglas* formula was intended "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination" in Title VII cases. *Burdine*, 450 U.S. at 255 n. 8. The Supreme Court was seeking to provide plaintiffs with a flexible means of establishing through circumstantial evidence an employer's discriminatory intent because direct proof is often unavailable. In theory, the *McDonnell–Douglas* approach operated as an information-forcing device by requiring employers to explain arguably suspicious activity.

Although it was perhaps useful at one time, the test no longer fulfills its intended goals. Rather than "fine-tune the presentation of proof," *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir.1995), the persistence of this analytic framework has led to widespread confusion over, and constant tinkering with, its internal mechanics. Courts have been consumed with such questions as when the burden should "shift," what it means for the prima facie case to "vanish" upon defendant's articulation of a nondiscriminatory rationale, and what the difference is (if any) between the proof of discrimination sufficient to meet the prima facie inquiry (the fourth prong of the first step) and that necessary to meet the third step.

Moreover, the multi-step approach actually invites juries and courts to lose sight of the "ultimate issue." Overly rigid application of the framework can focus a court's or jury's attention inordinately on whether each stage has been satisfied and away from the exis-

tence or non-existence of evidence of discrimination in the record. In addition, while the framework may not be unduly burdensome where a single allegation of discrimination has been made, it becomes all but unworkable when plaintiffs allege multiple claims. *See, e.g., Malladi v. Brown*, 987 F.Supp. 893 (M.D.Ala.1997) (conducting burden-shifting for every allegation raised); *Davis v. Bowes*, 95 Civ. 4765, 1997 WL 655935 (S.D.N.Y. Oct.20, 1997) (same).

Recent "clarification" of the *McDonnell–Douglas* test has eroded its usefulness even further. The first two steps, for all practical purposes, have fallen out of the equation. As to the first step, a plaintiff need only offer "minimal" proof of discrimination to establish a prima facie case. *See Fisher*, 114 F.3d at 1335; *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 65–66 (2d Cir.1995) (only "de minimis" showing necessary at first stage).[6] As to the second step, a defendant "need only articulate—but need not prove" the existence of a nondiscriminatory reason for its action. *Fisher v. Vassar College*, 70 F.3d 1420, 1433 (2d Cir.1995), *aff'd en banc*, 114 F.3d 1332 (1997). Of course, the employer in every case will articulate a nondiscriminatory reason for its action. It is difficult to imagine a case where a plaintiff prevails at the second step because a defendant is unwilling or unable to articulate some nondiscriminatory justification for its employment decision.[7] Thus, "this second stage is little more than a mechanical formality." *Shifting Burdens of Proof*, 109 Harv.L.Rev. at 1590.

■ At the same time, as *St. Mary's* and *Fisher* now make clear, a showing of pretext

---

5. Courts have, for example, stated that it is unwise to expose juries to this confusing analytic framework. As the First Circuit wrote in *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir.1979), "to read its technical aspects to a jury ... will add little to the juror's understanding of the case, and even worse, may lead jurors to abandon their own judgment and to seize upon poorly understood legalisms to decide the ultimate question of discrimination," *id.* at 1016; *see Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 85 (2d Cir.1983) (citing *Loeb* with approval in finding that instructing jury on "such lawyerly cant as 'prima facie case' and 'shifting burden of proof' would only have confused the jury"); *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1137

(4th Cir.1988) (criticizing "overly complex" burden-shifting instructions that required comprehension "beyond the function and expertise of the jury").

6. As the Second Circuit puts it: "In our diverse workplace, virtually any decision ... will support a slew of prima facie cases of discrimination." *Fisher*, 114 F.3d at 1337.

7. Theoretically, if plaintiff has established a prima facie case and "if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff." *Burdine*, 450 U.S. at 254.

is not, by itself, sufficient at the third step to sustain a finding of discrimination. Once a defendant has explained itself, the plaintiff must show not only that the defendant's explanations are pretextual, but that they are a pretext for discrimination. And she must do show without the benefit of any presumptions. *See Fisher,* 114 F.3d at 1336. As a result, one does not gain much, if anything, from conducting an analysis in the precise manner outlined by *McDonnell–Douglas.*

The practical effect of the confusion in this area of the law is that courts will often dutifully state the test (sometimes with a lengthy discussion of its various movable components) and then proceed to disregard it, or at least radically simplify it. Many courts, for example, assume for the purposes of argument that the first two steps have been satisfied and address only the third step. See, e.g., *Piraino v. International Orientation Resources, Inc.,* 137 F.3d 987, 990 n. 1 (7th Cir.1998) ("[T]he district court short-circuited the McDonnell Douglas analysis by assuming that [plaintiff] had established a prima facie case and that [defendant] had articulated a nondiscriminatory reason for the action taken."); *Jalal v. Columbia University,* No. 96 Civ. 5175, 1998 WL 106137, *9 (S.D.N.Y. Mar. 10, 1998) (declining to "dance mechanistically through the McDonnell–Douglas and Price Waterhouse 'minuets'" and proceeding to ultimate issue); *Padob v. Entex Information Serv.,* 960 F.Supp. 806, 812 (S.D.N.Y.1997) (refusing to "linger long on the first two stages of this analysis" and "turn[ing] directly" to the third stage). An increasing number of courts at least presume that a prima facie case has been established. See, e.g., *Bickerstaff v. Vassar College,* 992 F.Supp. 372 (S.D.N.Y. 1998); *Jugueta v. Perry,* No. 95 Civ. 10303, 1997 WL 742535, at *4 (S.D.N.Y. Dec. 1, 1997); *Bumpus v. Runyon,* No. 93 Civ. 3264, 1997 WL 539924, at *9 (S.D.N.Y. June 9, 1997); *Owens v. Waldorf–Astoria Corp.,* No. 92 Civ. 4561, 1997 WL 251556, at *3 (S.D.N.Y. May 13, 1997); *Santiago v. Greyhound Lines, Inc.,* 956 F.Supp. 144, 155 (N.D.N.Y.1997); *Holmes v. United Airlines, Inc.,* 94 Civ. 3564, 1996 WL 560193, *6 (S.D.N.Y. Jan. 2, 1996); *Coleman v. Runyon,* 898 F.Supp. 223, 226 (S.D.N.Y.1995), aff'd,

101 F.3d 681, 1996 WL 167853 (2d Cir.1996). Reviewing courts also typically take for granted that a prima facie case has been satisfied. See, e.g., *Sweeney v. Research Found. of State Univ. of New York,* 711 F.2d 1179, 1184 (2d Cir.1983) (stating that appellate courts should not be "preoccupied with" or "linger long over the question of whether . . . a prima facie case" has been made out). The image of neatly shifting burdens, therefore, is largely illusory.

The *McDonnell–Douglas* test has outlived its usefulness. Hence, it should be discarded and courts instead should focus on the "ultimate issue"—whether the plaintiff has proven that it is more likely than not that the employer's decision was motivated at least in part by an "impermissible," or discriminatory, reason. This streamlined approach would strip away tangential and distracting questions concerning the minutiae of the test's inner workings and reaffirm the purpose of Title VII: remedying discrimination, "subtle or otherwise." *McDonnell–Douglas,* 411 U.S. at 801.

■ In the summary judgment context, a more direct approach would also refocus attention on what should be the central inquiry: the evidence, or lack of evidence, of discrimination in a particular case. In considering a summary judgment motion, courts should address the ultimate issue by examining whether the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that a defendant's decisions were motivated at least in part by an impermissible reason. *See Fisher* at 1347. The court should conduct this inquiry in the following manner: first, by evaluating plaintiff's proof, direct or otherwise, of discrimination; second, by evaluating defendant's proof that it did not discriminate, including evidence of defendant's explanations for its decisions; and third, by considering the evidence as a whole, resolving all conflicts in the proof and drawing all reasonable inferences in favor of the plaintiff.

■ In considering the ultimate issue, a factfinder at trial or a court considering a motion for summary judgment must bear two concepts in mind. First, the issue is inten-

tional discrimination—the plaintiff has the burden at all times of proving, by a preponderance of the evidence, that she was the victim of intentional discrimination. *See St. Mary's,* 509 U.S. at 507 (stating that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (quoting *Burdine,* 450 U.S. at 253). It is not enough that the plaintiff was unfairly treated or that a defendant's stated reasons for its employment actions are proven to be pretextual. Rather, while unfair treatment and a defendant's false statements may constitute "pieces of circumstantial evidence" that support a claim of intentional discrimination, the evidence as a whole must be sufficient to sustain an "ultimate finding" of intentional discrimination. *Fisher,* 114 F.3d at 1338.

■ Second, at the same time, proof of discrimination is often elusive. Because an employer's "intent and state of mind are implicated," *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), "direct, smoking gun, evidence of discrimination" is rarely available. *Richards v. New York City Bd. of Educ.,* 668 F.Supp. 259, 265 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1288 (2d Cir.1988).[8] Courts must continue to be mindful that "clever men may easily conceal their motivations." *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1043 (2d Cir.1979) (quoting *United States v. City of Black Jack,* 508 F.2d 1179, 1185 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)); *accord Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *see also Tyler,* 958 F.2d at 1187 ("[If] there is at the very least a thick cloud of smoke," an employer must "convince the factfinder that, despite

the smoke, there is no fire.") (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 266, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). All a plaintiff need do is persuade a finder of fact that it is more likely than not that the adverse employment decision was motivated at least in part by an impermissible reason.

### B. *Application*

As Lapsley relies on the *McDonnell-Douglas* test and it remains governing law, I am bound to apply it. Rather than do so formalistically, however, I assume that Lapsley has made out a prima facie case.[9] Columbia has, of course, articulated legitimate, nondiscriminatory reasons for its actions. Hence, I proceed directly to the ultimate question: whether Lapsley has presented sufficient evidence from which a reasonable jury could find discrimination or retaliation. I do so by reviewing first Lapsley's evidence, then Columbia's evidence, and finally the record as a whole. I do so with respect to her claims of discrimination and retaliation separately.

#### 1. *Discrimination*

##### (a) *Plaintiff's Evidence*

Lapsley's purported evidence of discrimination consists of: (i) allegations of disparate treatment in the terms and conditions of her employment; (ii) the purported lack of substantial justification for her dismissal; (iii) the somewhat irregular manner in which she was notified of her dismissal; and (iv) Evans's alleged abrasive treatment of her. I examine below each of these items of proof.

##### (i) *Evidence of Disparate Treatment*

Lapsley alleges that Columbia treated her in a disparate manner because of her race in numerous respects: by denying her raises;

---

8. *See Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 638 (5th Cir.1985) ("Employers are rarely so cooperative as to include a notation in the personnel file, 'fired due to age,' or to inform a dismissed employee candidly that he is too old for the job."); *see also Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 899 (3d Cir.) (noting that direct proof of improper bias is "often unavailable or difficult to find"), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

9. Columbia argues that plaintiff's Title VII claims arising out of events taking place before October 6, 1994 are barred by the statute of limitations, contending that she is limited to circumstances within 180 days of her EEOC complaint. Lapsley, on the other hand, argues that she is entitled to 300 days. Because I have decided this motion on alternative grounds treating plaintiff's claims as timely, I need not reach this question. I assume, for purposes of this motion, that the 300-day period applies.

undercompensating her; failing to reclassify her position to level–5 and elevate her to it; denying her bonuses; and refusing to provide her with comparable overtime pay, training, and a cellular phone.

### (A) *Raises*

Lapsley's claim of discrimination in pay raises is simply not supported by the record. The undisputed facts show that she received numerous pay increases, which raised her annual salary from $17,044 when she started at Columbia in 1987 to $45,850 in 1995. As plaintiff herself acknowledges, her "requests for pay raises were always granted after numerous requests and complaints of being underpaid." (Lapsley Aff. ¶ 18). The only time her request was not granted outright, it was merely deferred until the following academic year; there is nothing to suggest that the delay resulted from Lapsley's race. Neither party disputes that Evans consistently recommended her for raises based on her performance, even though he was not required to do so.

In fact, plaintiff consistently received annual increases that met or exceeded the permissible range. Although the range for salary increases typically was 0–4% or 0–6% depending on the year, plaintiff received a 10% increase in 1991 and 1992, a 12% increase in 1993, and a 4% increase in 1994, the maximum permissible for that year under a new ceiling imposed by the Department Chair. (*See* Lapsley Dep. at 117–19). She also received additional increases each time she was promoted.

Pared to its core, Lapsley's real complaint is that she was inconvenienced by having to ask for raises that she always received: "I was always forced to make numerous requests and complaints of being underpaid." (Lapsley Aff. ¶ 10). The uncontradicted evidence demonstrates, however, that non-African American employees also had to request raises on occasion. (*See* Ellison Aff. ¶ 9).

### (B) *Salary*

Plaintiff further maintains that she was paid less than similarly-situated non-African American coworkers. The indisputable facts, however, show that she is wrong. Even a cursory examination of the salaries of Administrative Coordinators, before considering such crucial factors as experience, education, starting salaries, and performance, reveals no significant disparity in Lapsley's base salary, much less a marked disparity that would permit an inference of discriminatory intent.

The record shows that Administrative Coordinators earn between $28,567 to $61,874 depending on their responsibilities, starting salaries, past experience and education, and performance. (*See* Def.Ex. K). The accuracy of these numbers and these exhibits are not disputed by either party. At the time of her discharge in early 1995, Lapsley made $45,850 annually, by no means toward the low end of the relevant pay range. Of the three other Administrative Coordinators who started at Columbia in 1987, as did Lapsley, none earned as much as Lapsley. Indeed, she was paid more than eight Administrative Coordinators who each had between five and fifteen years more experience at Columbia. (*See id.*). Reasonably read, these numbers could not sustain an inference of discriminatory motive.

Furthermore, a university-wide salary review in 1992, which plaintiff does not challenge here, concluded that Lapsley was being "compensated similarly to other Administrative Coordinators performing similar duties." (Def.Ex.H). Considering the salary figures in light of Lapsley's lack of previous experience at Columbia, lack of any extensive supervisory experience, her level of education, and her relatively low starting salary and position, a rational factfinder could only conclude that plaintiff was appropriately compensated for her position, and that discrimination played no role in Columbia's determination of her salary.

### (C) *Reclassification and Promotion*

Plaintiff also maintains that she was "held back from a promotion to the position of Administrative Manager, Level 5 on the basis of [her] race and color." (Lapsley Aff. ¶ 27). She essentially contends that she was performing the tasks of a level–5 Administrative Manager but that defendant refused to reclassify her position to level–5 and promote her to it because of her race.

Lapsley has not, however, supported her contention with concrete facts. Although it is questionable whether Lapsley actually performed tasks equivalent to an Administrative Manager, level–5 or whether she would have satisfied the position's minimum qualifications,[10] I assume here that she did perform the work of a level–5 Manager. Nevertheless, she has still failed to provide evidence tending to show first, that she was entitled to the position, and second, that Columbia's refusal to reclassify her job and promote her to it resulted in part from racial considerations.

Even assuming that Lapsley performed certain tasks beyond that typically required of a level–4 Administrative Coordinator, she was not entitled to a reclassification of her job to level–5. Columbia submits evidence showing that reclassification of positions, in contrast to annual or interim raises or promotions, is not a routine practice; no one was guaranteed to have her role reclassified simply because she did a good job. Rather, reclassification occurred only when an individual's performance and institutional needs joined to justify reformulation of the formal expectations of and compensation for a particular position. (*See* Evans Aff. ¶ 15). Plaintiff, by contrast, offers nothing except conclusory allegations to challenge defendant's reclassification and promotion policies and practices.

In the event a jury could find that Lapsley was entitled to reclassification and promotion, she has still not provided any evidence to show that race played a part in defendant's refusal to follow through.[11] The record does reflect that on one or more occasions Evans raised, in Lapsley's presence, the possibility of reclassifying her position and, accepting plaintiff's allegations as true, he even promised to do so. But even if

Evans failed to live up to that promise, Lapsley has still adduced nothing from which a jury could reasonably find that Evans's refusal to act on her request or his own promises resulted from racial bias.

Seeking to demonstrate disparate treatment, Lapsley contends that June Ellison, a white employee, was elevated to the position of Program Coordinator, level–4, even though she possessed, in plaintiff's view, less departmental seniority and despite the departmental chairman's alleged recommendation that she be terminated from her position. (*See* Lapsley Aff. ¶ 34). Plaintiff suggests that defendant's creation of a new level–4 position for Ellison, a purportedly unqualified white individual, coupled with its refusal to create a new, higher position for Lapsley, evidences a discriminatory motive.

The flaw in plaintiff's argument, however, is that no rational jury could find that Ellison and Lapsley were similarly situated. To establish evidence of disparate treatment in this context, plaintiff must identify similarly-situated non-African American coworkers who were promoted while she was not. "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects." *Shumway,* 118 F.3d at 64.

Even a superficial comparison of the two employees' qualifications and duties reveals differences in virtually every material respect. First, Lapsley and Ellison had different job titles and responsibilities—Lapsley was an Administrative Coordinator primarily responsible for the processing of paperwork related to payroll and appointments, while Ellison served as a Program Coordinator, in which capacity she supervised five support

---

10. Defendant vigorously challenges plaintiff's contention that she performed duties equivalent to a level–5 Administrative Manager. To be eligible for this position, one must possess either a bachelor's degree or its equivalent in experience, "with at least three years of directly related experience." (Pl.Ex.D). An MBA, MBP or MHA is "desirable," and specialized knowledge of financial planning, computerized systems, and third-party reimbursement are "highly desirable." (*Id.*).

11. Plaintiff also half-heartedly suggests that she performed duties comparable to that performed by Robert Izuriata, a hispanic male who held the position of Business Manager, grade level–5. But there is nothing to suggest that he had comparable duties or experience. A rational jury, then, could not find that Izuriata is her counterpart. The unrebutted evidence shows not only that he held a different title, but that he supervised five support staff, handled "multi-million dollar accounts," and assisted with various aspects of the department. (Evans Aff. ¶ 19).

staff members,[12] coordinated transplant lists and organ availability, and managed the administration of the transplant center. (*See* Ellison Aff. ¶ 5; Evans Aff. ¶ 38). Lapsley, on the other hand, was not a physician's secretary and had no comparable clinical duties.

Second, by her own admission, plaintiff was not trained for Ellison's position; conversely, Ellison apparently was not equipped for Lapsley's job. (*See* Lapsley Dep. at 141).

Third, the two employees differed markedly in terms of their previous work experience and education. Whereas Ellison had worked for Columbia since 1982 and had twenty-six years of experience working for hospitals when Columbia reclassified her position, Lapsley had worked for the university for just seven years when she sought reclassification of her post. And while Ellison held a Bachelors of Science, Lapsley did not have a formal education beyond high school.

### (D) *Bonuses*

■■■ Lapsley further contends that she was denied annual bonuses based on her race, while bonuses routinely were given to similarly-situated non-African American employees. She maintains that Peggy Haubert ("Haubert") and Diana Walsh ("Walsh"), both white females, were given such bonuses. (*See* Lapsley Aff. ¶¶ 32, 42). Lapsley, on the other hand, never received a year-end bonus during her tenure at Columbia.

The uncontradicted evidence, however, is that Columbia did not grant bonuses to managerial employees until 1994. Thus, as Lapsley concedes, she was not eligible for a bonus until the last year of her employment. (*See* Lapsley Dep. at 243–44). As of March 29, 1994, the department was authorized for the first time to recommend *any* officer for a one-time bonus in recognition of "completion of a special assignment or work performed above and beyond the regular job duties." (Def.Ex.R). A person recommended for a bonus had to have demonstrated "extraordinary effort and performance on the job." (*Id.*). Because the granting of a bonus is a

purely discretionary decision based on recommendations from supervisors and subject to approval from Human Resources, Lapsley had no entitlement to a bonus.

While it is doubtful that she could show at trial that she would have qualified for a bonus, *i.e.*, that her performance during her final year at Columbia was in any way "extraordinary," I will assume that Lapsley was eligible for a bonus in 1994. Even so, she has failed to submit any evidence showing that Evans's refusal to recommend her for a bonus in 1994 was due to her race. Lapsley acknowledges, for example, that no managerial employee on Evans's staff received a bonus in 1994. (*See* Lapsley Dep. at 246).

Furthermore, seen in context, the fact that Haubert and Walsh received bonuses is not probative of racial bias. Defendant provides numerous affidavits and correspondence demonstrating that when exceptions to the no-bonus rule were made before March of 1994, the bonuses were paid out of outside or private funds. According to documents submitted by Columbia, Haubert received a bonus last year paid by her supervisor Doctor Smith's private practice account. (*See* Haubert Aff. ¶ 6). Before last year, Haubert's bonuses apparently were paid out of Presbyterian Hospital's funds. (Evans.Aff.¶ 49). Similarly, Walsh periodically receives a bonus pursuant to an arrangement between her supervisor Dr. Paul LoGerfo and Columbia as a condition of moving Dr. LoGerfo's clinical practice to the university. (*See* Letter from Evans to Ferguson dated October 27, 1994, Def.Ex. M). Lapsley does not question the existence of separate accounts and employers, but merely speculates that these accounts could be manipulated at will. This speculation will not suffice to defeat summary judgment.

### (E) *Overtime, Training Opportunities, and Cell Phones*

Plaintiff's pleadings and affidavit also contain various complaints that border on the ludicrous: specifically, that she was denied

---

**12.** Lapsley alleges in her pleadings that she had supervisory authority. During her deposition, however, she made clear that she had no signature authority, and clarified that what she called "supervising" actually consisted of mere processing of timekeeping paperwork for the business office staff. (*See* Lapsley Dep. at 38, 130–32).

cash compensation for overtime, training opportunities, and the use of a cellular phone because of her race. There is not a shred of evidence in the record to support any of these charges.

■ Lapsley maintains, for example, that she was forced to accept compensatory time for her work during resident interviews, which took place on certain weekends during the recruitment season, while similarly-situated non-African American employees were paid cash for overtime worked. Defendant, in contrast, argues that as a Columbia employee Lapsley was not entitled to cash compensation. It relies on an affidavit by Sybil Williams, the former Vice President of Human Resources, wherein she states that "as part of their managerial responsibilities, [managerial staffmembers] are expected to work overtime if necessary without additional compensation." (Williams Aff. ¶ 13).

Plaintiff cannot show that, more likely than not, the decision to provide her with compensatory time as opposed to cash was made on a racial basis. She concedes that Columbia and Doctors Private Offices have different overtime policies (see Lapsley Dep. at 266), and that Columbia, Lapsley's employer, does not provide its managerial employees with overtime pay, but instead offer compensatory time. Accordingly, there is no issue of fact as to whether defendant's overtime policy was applied to Lapsley in a racially discriminatory fashion.

■ Plaintiff argues, in addition, that she was denied training opportunities based on her race, but acknowledges that the only times she sought to attend a seminar—first in 1992, and again in 1993—Evans offered race-neutral explanations for his refusal to allow her to do so. In 1992, Evans told her that the office was simply too busy, and he did not allow any other employee to attend seminars. (See Lapsley Dep. at 290–91). In 1993, Evans again told Lapsley that her work was too important to permit her time off, and did not allow anyone else from the department to attend educational sessions. (Id. at 292–96). Although Lapsley subjectively feels that Evans "lied" about his reasons, there is nothing to sustain her purely conclusory

statements that Evans's explanations were pretextual in nature.

■ Lapsley also alleges that she was denied the use of a cellular phone because of her race while Ellison, a white woman, was permitted to use one. (See Compl. ¶ 14(h)). But plaintiff fails to raise a genuine issue of fact as to defendant's nondiscriminatory rationale for Ellison's use of the phone: Ellison was responsible for coordinating transplant activities and overseeing the flow of patients through Presbyterian Hospital's Comprehensive Transplant Center, which required her to be reachable by hospital staff at any time (see Def.Ex. L), while Lapsley had no comparable emergency-related clinical responsibilities.

### (ii) *Lapsley's Dismissal*

Lapsley contends that Columbia discriminated against her by dismissing her on account of her race and by providing her with a severance package that materially differed from that provided to non-African American employees who are laid off.

Lapsley's strongest evidence of discrimination is her evidence of pretext—which arguably shows that Columbia's articulated reasons for dismissing her are pretextual because there was insufficient justification for her discharge. Construing the record in the light most favorable to plaintiff, she was a stellar employee from 1987 through 1993. A jury could reasonably conclude that Columbia acted irrationally in dismissing an otherwise excellent employee merely because she had a run of lateness and absences that resulted from genuine illnesses or injuries. Moreover, Lapsley apparently was the only employee on Evans's staff "restructured" out of a job. Finally, although Lapsley unsuccessfully lobbied to have her position upgraded to a grade level–5, the position was upgraded immediately after she was dismissed. But even assuming a reasonable jury could find that Columbia's stated reasons for dismissing Lapsley are pretextual, it remains to be seen whether the jury could find that the pretext was a mask for discrimination. I discuss this issue in greater detail below, after evaluating Columbia's evidence that it did not discriminate.

Lapsley also asserts that Columbia's failure to provide her with written reprimands regarding any unsatisfactory performance casts doubt on Columbia's explanations. The record shows, however, that university policy does not require written warnings before dismissal.[13] (Williams Aff. ¶ 12). Lapsley herself states that she never received written evaluations, positive or negative, once she was elevated to a managerial role within the department. While she disputes whether Evans spoke to her about her "performance," she concedes that the two of them had discussed his unhappiness about her tardiness more than once in 1994. Lapsley, moreover, offers nothing beyond conclusory denials to contradict defendant's proof that long before Evans decided she should be discharged, he had several conversations with Human Resources about his unhappiness with her work. She also does not deny that Dr. Rose candidly explained to her that her attendance in 1994 played a substantial role in Evans's decision to lay her off.

Lapsley argues, moreover, that at least two non-African American employees were given several months' notice of their impending layoffs and were permitted to stay on at Columbia until they found suitable positions. She claims that defendant's failure to provide her with comparable advance warning constitutes discriminatory treatment. (Id. ¶ 54). Although plaintiff has certainly pointed to differential treatment, she has presented no evidence to suggest that Columbia's decision to afford her only one month's notice resulted from racial animus.

Lapsley also insists that Columbia did not provide her with the kind of severance package typically afforded white employees who have been laid off. She concedes, however, that university policy requires only that she receive one month's salary for each year she was employed, which she in fact received. (See Lapsley Aff. ¶¶ 54–55).

Finally, Lapsley complains that she "was never called back from lay-off status or offered another position within the university." (Lapsley Aff. ¶ 53). Columbia insists that its policy does not require it to rehire managerial employees who have been laid off. (See Williams Aff. ¶¶ 14–15). Plaintiff does not dispute this policy. More important, she has failed to provide any evidence that she was not rehired or offered another post because of her race.

### (iii) *The Dismissal Notices*

Plaintiff contends that Columbia's issuance of two separate notices of dismissal shows that it fabricated its explanations after the fact. The first notice states that Lapsley was being laid off because Columbia needed to reduce the staff. The second notice, received roughly a week later, states that plaintiff's position was being phased out as a part of wider efforts to reorganize the Academic Affairs Office. Although it is strange that two notices were issued (Columbia offers no explanation), this irregularity does not constitute a "shift" in justifications that would constitute some evidence of discrimination. See *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 132–33 (2d Cir.1987). The explanations given for Lapsley's dismissal in the two notices are not inconsistent—the second notice appears to offer a clarification of Columbia's justification for dismissing her, and does not provide a substantially different or inconsistent explanation. Absent other colorable evidence of discrimination, the irregularity of two notices provides little support for plaintiff's claims here.

### (iv) *Evans's Purported Abrasiveness*

Plaintiff also alleges that "[o]n or about June 1994, and continuing to the date of her termination, the defendant maintained a racially hostile atmosphere" (Compl.¶ 14(i)), but offers no details other than that she was berated in front of fellow workers in June and December of 1994. Open criticism of Lapsley on these occasions, however, does not suffice to establish a racially hostile work environment. See *Oncale v. Sundowner Offshore Servs., Inc.*, —— U.S. ——, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (reaffirming principle that Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's

13. The sole piece of evidence proffered by plaintiff, a letter from Evans to an employee in which Evans seeks a meeting with the employee to discuss his absenteeism and tardiness, neither alludes to nor establishes such a policy. (See Pl.Ex. O).

employment"); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir. 1996) ("[P]laintiff must show workplace was permeated with discriminatory intimidation that was so sufficiently severe or pervasive to alter the conditions of her work."). Thus, even if a jury were to credit her vague allegations, they would not be actionable.

■ In any event, Lapsley concedes that her supervisor Evans had an abrasive personality, was demanding, and displayed a "confrontational" working style in dealing with colleagues and subordinates. (Lapsley Dep. at 55, 69). According to her own testimony, a number of non-African American employees routinely faced his wrath, and more than one left because of Evans's less than congenial demeanor. (*See* Lapsley Dep. at 42–54, 58, 67, 75–76). On this record—rife with overwhelming evidence that her supervisor could be difficult to employees of all racial backgrounds—a reasonable juror could only find that Lapsley's employer did not foster a racially hostile work environment.

### (v) *Summary of Plaintiff's Evidence*

In the end, plaintiff's evidence of discrimination is razor thin. She alleges numerous instances of disparate treatment, but the incontrovertible evidence shows that the disparity is either non-existent or explained by a legitimate, nondiscriminatory justification. She has presented no credible evidence that any disparate treatment was based on her race. Nor has she presented any evidence of remarks evidencing bias or any statistics that are suggestive of discrimination. At best, she has presented some evidence showing that Columbia did not have a strong basis for firing her, some evidence of pretext, and some evidence of irregularities in the process by which she was notified of her dismissal.

I turn now to defendant's evidence.

### (b) *Defendant's Evidence*

In addition to the evidence reviewed above establishing that no genuine issue of fact exists as to whether Lapsley was treated in a disparate manner because of race, Columbia relies on evidence tending to show that (i) it dismissed Lapsley because of dissatisfaction with her attendance and work performance, as well as restructuring needs; and (ii) Evans, the person accused of discriminating against Lapsley because of her race, was the person largely responsible for her many raises and promotions over the first six years of her employment.

### (i) *Columbia's Reasons for Dismissing Plaintiff*

Columbia presents substantial evidence showing that it discharged Lapsley for a combination of factors: her unsatisfactory performance in 1994 and the department's need for a new position with greater responsibilities and a candidate possessing more experience. In defendant's view, it became "apparent ... that Ms. Lapsley not only ... lacked the necessary skills required for the position, but that a reassessment of her position and the functions needed to meet the new chairman's goals was required." (Evans Aff. ¶ 55). It bolsters these explanations with the following undisputed facts: Lapsley was warned orally on more than one occasion in 1994 that her lateness was unacceptable (*see* Lapsley Dep. at 217–18); several months before Evans decided to dismiss her, he spoke to Human Resources "four or five" times about his unhappiness with Lapsley's performance;[14] she acknowledges that Evans "became dissatisfied with [her] when [she] returned to work on a full-time basis" (Lapsley Aff. ¶ 52); she was informed by Dr. Rose, the new Department Chief, that she was being dismissed in part because of her attendance in 1994 (*see* Lapsley Aff. at 413–14); she was aware of ongoing efforts to restructure the department (*see, e.g.,* Def. Exs. B, T), and that the changes could affect her job; and she twice received written notification that she was being laid off based on downsizing and/or restructuring.

### (ii) *Evans's Role*

It is undisputed that Evans—who Lapsley contends is the person responsible for the

---

**14.** Evans's and Williams's affidavits both corroborate defendant's argument that these conversations took place. While Evans is self-interested, it would be more difficult for a rational jury to reject out of hand the testimony of Williams, who no longer works for Columbia. Indeed, despite professing no knowledge of these conversations, Lapsley does not deny that they took place.

purportedly discriminatory decision to fire her—was largely responsible for Lapsley's three promotions, including the one that brought her to her level-4 post, and numerous raises over the course of her first six years. Indeed, the record reflects that Evans recommended Lapsley for a salary increase at the end of her probationary period in 1988; that he selected her as his Administrative Assistant and promoted her to that position; that he determined it would be appropriate to promote her to Administrative Coordinator in 1991; that he requested a 14% increase in her salary in April of 1991 and an additional 6% increase in July of 1991; and that he recommended a salary increase for her in April 1992 notwithstanding the results of the university-wide parity review.

Evans's consistently favorable treatment of Lapsley for six years considerably undercuts her claim that he was racially biased against her in 1994. Because the same person who repeatedly gave plaintiff promotions and salary increases, and selected her to be his Administrative Assistant, made the decision to discharge her, this factor strongly suggests that invidious discrimination was not a cause of her layoff. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.").

### (c) *The Record as a Whole*

■ Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in favor of the plaintiff, I conclude that a reasonable jury could not find that Lapsley was discriminated against for an impermissible reason.

As noted above, plaintiff has presented some arguable evidence of discrimination.

Far from presenting a "thick cloud," however, she has presented but a fleeting wisp of smoke that is easily dissipated by Columbia's proof that its conduct was legitimate and lawful. Moreover, as the Second Circuit has held in an age discrimination case,

> [S]ome evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the [alleged unlawful reason] was the real reason for the discharge.

*Woroski v. Nashua Corp.*, 31 F.3d 105, 109–10 (2d Cir.1994) (emphasis in original and citation omitted).

Although Lapsley has presented some evidence of pretext, it is undermined to a great extent by the undisputed evidence that Lapsley was excessively absent and late in 1994. Although she quarrels with the exact count, it appears she was absent some 40 days or more in 1994. On other days she was late or could only work part-time.

■ Moreover, even assuming that a reasonable jury could find pretext, on the undisputed facts no reasonable jury could find that the pretext was a mask for racial discrimination.[15] No reasonable jury could conclude that Evans, the person who consistently supported Lapsley and repeatedly helped her obtain promotions and pay raises over a six-year period, who chose her to be *his* Administrative Assistant, suddenly became biased against her in 1994 because of her race. And although it is theoretically possible that someone else involved in the decision to dismiss Lapsley considered her race as a determinative factor, she neither alleges, nor of-

---

**15.** As the *Fisher* Court made clear, a finding of pretext does "not necessarily mean that the true motive was the illegal one argued by the plaintiff." 114 F.3d at 1338. "[D]iscrimination does not lurk behind every inaccurate statement." *Id.* at 1337. Instead, the pretext may mask some other unbecoming, albeit legal, motivation, such as "back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." *Id.* Here, because it has not even conceded the possibility that its stated rea-

sons are pretextual, Columbia has made no effort to offer any alternative explanation for its employment decision. Even assuming pretext, I note that, without so finding, the record supports an inference that Lapsley may have been discharged because she constantly complained about being underpaid and was not appreciative of the promotions and raises she received. Lapsley herself believed that she was laid off in part "as a result of [her] continuous complaints regarding [her] salary." (Lapsley Aff. ¶ 48).

fers evidence of, any involvement or bias by any other individual.

To merit a trial on any of Lapsley's claims, the evidence must show that, more likely than not, Columbia's "proffered reason[s] was not the true reason for the employment decision, and that race was." *Fisher,* 114 F.3d at 1336 (quoting *St. Mary's,* 509 U.S. at 507–08); *see also Quaratino,* 71 F.3d at 64 ("An employer's reason for termination cannot be proven to be a pretext for discrimination unless it is shown to be false *and* that discrimination was the real reason."). On the undisputed facts of this case, no reasonable jury could conclude that, more likely than not, discrimination was the reason for Columbia's actions. Plaintiff simply has not presented sufficient evidence to support a jury verdict in her favor on the "ultimate issue." Accordingly, Columbia is entitled to summary judgment dismissing plaintiff's claims of discrimination.

### 2. *Retaliation*

Lapsley also alleges that she was discharged because "she had protested and objected to the disparate treatment afforded her by the defendant." (Compl.¶ 15). There is, however, inadequate evidence on which to base a finding that she was fired in retaliation for complaining about discrimination in the workplace.[16]

Title VII prohibits employers from discriminating against employees for opposing an "unlawful employment practice" as defined by its provisions. *See* 42 U.S.C. § 2000e–3(a). To prevail on her claim of retaliation, plaintiff must demonstrate that (1) she was engaged in a protected activity; (2) the employer was aware of the activity; (3) the employer took some adverse employment action against her; and (4) a causal connection exists between her participation in a protected activity and the adverse employment actions. *See Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998).

While Lapsley arguably could meet the second and third prongs of the test, if permitted a chance to present her case at trial, she could not show that she was engaged in protected activity or that her participation in such activity led to her eventual termination. She points to a single encounter with Evans as evidence of her alleged protected conduct[17]—that in January of 1994 when she learned of Ellison's promotion, she had the following exchange with Evans:

A: I said, "I would hate to feel that I was being discriminated against," and he said, "Tonya, how could you say that to me? Have I ever discriminated against you before?" I said, "I could see that I was being treated differently as opposed to other whites and Hispanic employees."

Q: That's what you said?

A: That's exactly what I said.

(Lapsley Dep. at 188–89). The conversation then "basically ended." (*Id.* at 189).

Even giving Lapsley the benefit of the doubt, her passing remarks could not be reasonably construed as protected activity. To demonstrate participation in protected activity, a plaintiff must show that, in the totality of the circumstances, she had a "good faith, reasonable belief that the underlying employment practice was unlawful." *Galdieri–Ambrosini,* 136 F.3d 276, at 292. Lapsley's evidence fails this test.

First, although "informal protests of discrimination" may constitute protected activity, *see Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990), "careless and uncounseled accusations of discrimination" are not necessarily protected. *See Bray v. Tenax Corp.,* 905 F.Supp. 324 (E.D.N.C.1995). Here, Lapsley's passing re-

---

16. Nor is there anything to sustain Lapsley's allegation that Evans retaliated against her by having her "black-balled from the University." (Lapsley Aff. ¶ 47). There is no evidence indicating that she even applied for any other position at Columbia, including the newly reorganized position in the Department.

17. Plaintiff also claims to have had a conversation with Williams in which she expressed her feeling that she had been discriminated against. She further asserts that at one point she threatened Evans with a lawsuit. (*See* Lapsley Dep. at 351–52, 356). But both of these events took place *after* her layoff, and hence, cannot be said to have affected Columbia's decision to let her go.

mark did not even rise to the level of an accusation. During the exchange with Evans, Lapsley expressed displeasure at a colleague's good fortune in having been recently promoted and speculated that she "would" hate to feel discriminated against. At best, the casual comment suggests that she felt discrimination had occurred, but she did not explain the basis of her feeling, and, in any event, the topic was quickly dropped. Lapsley never again raised the issue with a co-worker or superior; nor did she lodge any complaint. Hence, Lapsley's remark can hardly be said to rise even to an "informal complaint."

Second, given the casual and vague nature of her remark to her supervisor, that she never articulated the basis for her belief of discrimination, and that "there was no semblance of [race]-oriented motivation in the events" described by Lapsley, *id.* at 292, one cannot say that Lapsley's subjective belief that discrimination had occurred was a reasonable one, however intensely felt and even if it was held in good faith. As discussed earlier, Lapsley has provided no evidence tending to show that race played any role in either defendant's decision to promote Ellison or its decision not to reclassify Lapsley's position. *See Galdieri–Ambrosini,* 136 F.3d 276, 292 (summary judgment on retaliation claim appropriate where plaintiff's "genuine" belief that discrimination had occurred was unfounded).

Moreover, even if her comments constitute protected activity and she had a good faith, reasonable basis for her belief of discrimination, Lapsley could not demonstrate causation. She offers no proof of causation other than the mere fact that she was discharged at some point after this conversation with Evans. Although proximity in time between an employee's protected activity and her termination may under certain circumstances give rise to an inference of causation, *see Nielsen v. New York City Comm'n on Human Rights,* No. 94 Civ. 6360, 1998 WL 20004, at *11 (S.D.N.Y. Jan.20, 1998), "[c]onversely, causation is less likely if there is a long hiatus between the protected activity and the termination." *Id.* at *10. Lapsley allegedly had the conversation with Evans in January of 1994, but she was not terminated

from her position until the end of the year. Where, as here, nearly a full year passed between Lapsley's comments and defendant's decision to lay her off, a finding that her passing remark led to her dismissal a year later would be unreasonable. *See Van Zant,* 80 F.3d at 714 (summary judgment appropriate where plaintiff "put forward nothing other than conclusory allegations to suggest a causal relationship between her complaints . . . [and] her termination."). A rational jury, therefore, could not find that she was dismissed in retaliation for her statements to Evans in January.

### 3. *Intentional Infliction of Emotional Distress*

As a final matter, I hold that Lapsley is not entitled to a trial on her claim of intentional infliction of emotional distress.

To sustain a claim under New York law for intentional infliction of emotional distress, an at-will employee must prove that defendant engaged in "extreme and outrageous conduct" and that defendant intentionally or recklessly caused plaintiffs to suffer emotional distress. *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983); *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215 (1978).

The offending conduct must "consist of more than mere insults, indignities, and annoyances and must be so shocking and outrageous as to exceed all reasonable bounds of indecency." *Nestlerode v. Federal Ins. Co.,* 66 A.D.2d 504, 414 N.Y.S.2d 398, 400 (4th Dep't 1979).

Here, no reasonable jury could find defendant liable for any "shocking and outrageous" conduct. Plaintiff states in her affidavit that Evans told her that she should "choose her company more carefully since [he] did not know how long" certain low-level African–American employees would be around. (Lapsley Aff. ¶ 52). In addition, she claims to have "experienced intentional emotional distress at various staff meetings and insults in the presence of various employees." (*Id.* ¶ 56). Her submissions, how-

ever, contain no other specifics concerning the alleged insults she suffered on these occasions.

■ Even if true, such conduct would not meet the exacting standard required for the imposition of this type of tort liability. *See, e.g., Bradley v. Consolidated Edison Co.,* 657 F.Supp. 197 (S.D.N.Y.1987) (negative evaluations and disparaging statements insufficient to state claim); *Brink's Inc. v. City of New York,* 533 F.Supp. 1123 (S.D.N.Y.1982) (harassment and verbal abuse insufficient to make out claim). Indeed, these purely "conclusory allegations," without any concrete particulars or proof as to the source of these statements, the content of the statements, and when they transpired, do not create a question of fact sufficient to defeat summary judgment. *See National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989). Accordingly, this count is dismissed.

## CONCLUSION

Defendant's motion for summary judgment is granted in its entirety, and the complaint is dismissed with prejudice but without costs. The Clerk of the Court is directed to enter judgment in favor of defendant.

SO ORDERED.