**Everett STEMBRIDGE, Plaintiff,**

v.

**CITY OF NEW YORK, et al., Defendants.**

**No. 95 Civ. 3219(CBM).**

United States District Court, S.D. New York.

March 24, 2000.

Laura S. Schnell, New York City, for Plaintiff.

Corporation Counsel of the City of New York, by, Michael D. Hess, New York City, for Defendants.

## OPINION

MOTLEY, District Judge.

Plaintiff, Everett Stembridge, an African–American male, brought this employment discrimination suit against his former employer, the New York City Department of Transportation ("DOT") and the City of New York, pursuant to Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). He alleged discrimination based on race and/or national origin, with respect to: termination of employment, constructive discharge, failure to promote, unequal terms and conditions of employment, hostile work environment and harassment, retaliation for opposing unlawful employment practices, intentional infliction of emotional distress, slander per se, defamation of character, assault and battery, and continuing violation. Plaintiff initially acted pro se but ultimately obtained counsel.

In a prior decision in this case, defendants were granted summary judgment on all causes of action except the constructive discharge, retaliation, hostile work environment and disparate treatment claims. Defendants now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on all of the remaining causes of action, seeking to dismiss the action in its entirety. As discussed in the opinion below, the court now grants defendants' motion for summary judgment as to plaintiff's disparate treatment claims relating to his transfer and suspension, his claim of hostile work environment, constructive discharge claim and his retaliation claim.

## I.  BACKGROUND

### A.  Factual Background

Plaintiff, an African–American male, began working for the New York City Department of Transportation in 1989. Amended Complaint ¶ 2 ("Am.Compl."). Plaintiff interviewed with Richard Matarangelo, Chief of the Parking Control Unit ("PCU"), and was offered a position in the newly formed PCU. *Id.* On or about August 7, 1989, Matarangelo assigned plaintiff the position of Associate Staff Analyst. Declaration of John Weiss Ex. 1. In his new post, plaintiff's immediate supervisor was Matarangelo. *Id.*

While Matarangelo was the Chief of the PCU, the overall racial makeup of the unit

was approximately 60% African–American, 30% Hispanic and 10% Caucasian or other. Decl. of Richard A. Matarangelo ¶ 3. On the managerial level, two of three Assistant Chiefs were members of minority groups as of August 31, 1989. Decl. of Richard A. Matarangelo ¶ 4. Of the nine Chiefs and Captains in the unit, seven were minorities: three were Hispanic, three were African–American and one was Indian. Decl. of Richard A. Matarangelo ¶ 6.

At the start of his tenure at the PCU, plaintiff's superiors gave him positive performance evaluations and recommended him for raises and special programs. For the periods between August 1989 and December 1991, plaintiff received overall performance ratings of "outstanding." Weiss Ex. 3. On May 29, 1990, Matarangelo recommended plaintiff for a merit raise. Weiss Ex. 4. On November 2, 1990, in a memorandum addressed to "All Personnel," Matarangelo assigned plaintiff to the position of Assistant Chief of Operations Analysis. Weiss Ex. 5. Later, in 1991, Matarangelo recommended plaintiff for the Career Development Program, describing plaintiff as one of the unit's "most dedicated and enthusiastic employees." Weiss Ex. 6.

After 1991, plaintiff became the subject of disciplinary actions and close monitoring. He then began to complain that he was the subject of discrimination by his supervisors. On May 27, 1992, Matarangelo sent a memorandum to plaintiff limiting the flexibility of plaintiff's work schedule and requesting weekly progress reports from plaintiff. Weiss Ex. 9. Shortly thereafter, on June 1, 1992, plaintiff filed a discrimination complaint with the DOT's Equal Employment Opportunity Office ("EEO") alleging racial discrimination, complaining of Matarangelo's "overbearing behavior" and "dominance/supremacy problem." Weiss Ex. 10. On July 1, 1992, plaintiff received a formal reprimand from Matarangelo for walking out of a training session. Weiss Ex. 12. Matarangelo then withdrew plaintiff from participation in the telecom-

muting prorgram on July 6, 1992. Pl.'s Aff. Opp'n to Summ. J. Ex. G. In a July 31 report, after meeting with Matarangelo and plaintiff separately, the EEO director found that there was no evidence of discrimination or harassment by Matarangelo. Weiss Ex. 11.

Plaintiff alleges that Matarangelo made several offensive comments while plaintiff was assigned to PCU. Plaintiff claims that Matarangelo referred to him as being "different from other minorities in the office." Pl's Aff. Opp'n to Summ. J. ¶ 8. Plaintiff also alleges that Matarangelo referred to African–American youths as "animals" during a conversation about a murder at a local rap concert. Id. Finally, plaintiff complains that Matarangelo repeatedly referred to then Mayor David Dinkins as a "washroom attendant." Id.

Towards the end of September 1992, a controversy arose surrounding plaintiff's use of the facsimile machine, resulting in further discrimination allegations by plaintiff. In the course of attempting to send a personal facsimile, a dispute ensued between plaintiff and the Authorized Fax Operator. Pl's Aff. Opp'n to Summ. J. ¶ 13. This dispute resulted in a several-week long exchange of memoranda regarding the episode. Weiss Ex. 14. Included in this exchange was a memorandum from the Fax Operator to an Assistant Chief in the PCU complaining that she felt harassed by plaintiff during the incident. Id. Finally, on or about October 5, 1992, Deputy Chief Michael Gregorio called plaintiff in for a meeting to discuss the matter. Id. In an October 7, 1992 memorandum to Matarangelo, Deputy Chief Gregorio suggested that plaintiff should seek counseling. Id. In response, plaintiff wrote a memorandum complaining that Gregorio's statement constituted racial discrimination. Id. On October 16, 1992, plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging that Matarangelo and Gregorio had been treating him in a discriminatory manner–specifically referring to Gregorio's

comment in the addendum to the complaint. Weiss Ex. 15.

On December 3, 1992, after receiving notice of plaintiff's second discrimination complaint, the Employee Relations Office decided to transfer plaintiff to the Safety Engineering Unit ("SEU") pending resolution of the discrimination complaint. Weiss Ex. 16, 17. Plaintiff complained of several discriminatory acts occurring both at PCU and at SEU. On December 24, 1992, on plaintiff's last evening at PCU, plaintiff claims that Michael Raykowski, a member of the management team at PCU, threatened to lock plaintiff in the office or to have him arrested if he did not leave by 6:30 p.m., and then called plaintiff an "uppity nigger." Pl's Aff. Opp'n to Summ. J. ¶ 15; Weiss Ex. 18. As of December 31, 1992, plaintiff received an overall performance rating of "good," with a notation that his "[l]evel of performance declined sharply." Weiss Ex. 19. Plaintiff complains that while he was working at SEU, a co-worker hung a black doll on an office door which was taken down the next day after plaintiff brought it to the attention of his supervisor. Pl's Aff. Opp'n to Summ. J. ¶ 18; Pl's Aff. Opp'n to Summ. J. Ex. F. Plaintiff also alleges that an anonymous note was left on his desk saying "dump the dink." Plaintiff believes this was a reference to then Mayor David Dinkins. *Id.* at ¶ 19.

On July 14, 1993, an altercation occurred between plaintiff and one of his supervisors which led to plaintiff's suspension and ultimate resignation from DOT. According to plaintiff, during the dispute, his supervisor, Joel Friedman, called him "boy," hit plaintiff in the chest, and slammed plaintiff up against a file cabinet. Pl's Aff. Opp'n to Summ. J. Ex. I at 78–79. The encounter ended with the police escorting plaintiff from the DOT building. *Id.* On July 15, 1993, plaintiff was suspended without pay. Weiss Ex. 24. The suspension was subsequently lifted effective July 26, 1993, and a disciplinary hearing was scheduled for August 18, 1993. Weiss Ex. 28; Weiss Ex. 24; Def.'s Mem. Supp. Summ. J. at 6. Plaintiff had been charged with, among other things, grabbing Friedman's arm during the July 14, 1993 episode. Weiss Ex. 25. When plaintiff returned to work, he was directed to perform a research assignment at Police Plaza. Weiss Ex. 27. On August 18, 1993, plaintiff resigned from his position at DOT and the disciplinary hearing was canceled at his attorney's request. Weiss Ex. 28.

## B. Procedural Background

Plaintiff filed an amended complaint on October 27, 1995, adding claims for intentional infliction of emotional distress, slander and defamation. In a March 31, 1997 order, Judge Wood dismissed plaintiff's state law claims and granted partial summary judgment in favor of defendants, finding that: (1) plaintiff's state law claims were time barred, (2) plaintiff failed to allege facts to support claims of termination and failure to promote, and (3) plaintiff's continuing violation claim does not constitute a distinct cause of action. Order dated March 31, 1997. Accordingly, the claims remaining before this court are plaintiff's claims of disparate treatment involving his transfer and suspension, hostile work environment, retaliation and constructive discharge causes of action. The case was reassigned to this court from Judge Wood on October 30, 1998.

At the close of discovery, defendants moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, claiming that plaintiff has failed to demonstrate a prima facie case of racial discrimination under Title VII and that plaintiff has not met his burden of proof in establishing his claims. At this point, plaintiff finally retained counsel. The motion for partial summary judgment having been fully briefed by both parties, and hearing having been held on the motion, in accordance with the discussion below, the court now grants defendants' motion for summary judgment as to all of plaintiff's remaining claims: disparate treatment, hostile work environment, retaliation and constructive discharge and

dismisses this action in its entirety with prejudice.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper where "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Belfi v. F. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999). A genuine issue of material fact is present if the fact "[w]ill affect the outcome of the suit under governing law" and the supporting evidence is "[s]uch that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In evaluating a summary judgment motion, "[t]he judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *See Sutera v. Schering Corp.*, 73 F.3d 13, 15 (2d Cir. 1995). "In making its determination, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Sorlucco v. New York City Police Department*, 888 F.2d 4, 5 (2d Cir.1989); *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*).

The party seeking summary judgment, "[a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548; *See Gallo v. Prudential Residential Services*, 22 F.3d 1219 (2d Cir.1994). Where the nonmoving party bears the ultimate burden of proof at trial, the motion may not be rebutted by restating allegations in the pleadings or statements in the party's own affidavit, rather, the nonmoving party must "[d]esignate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Gibson v. American Broadcasting Companies*, 892 F.2d 1128, 1132 (2d Cir.1989). The nonmoving party has failed to meet its burden "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1223 (2d Cir.1994).

Indeed, the Second Circuit has directed that trial courts "[b]e especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999); *See also Gallo v. Prudential Residential Services*, 22 F.3d at 1223 ("Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.*). Nonetheless, "[w]here intent is genuinely in issue, ... summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994)

### B. Disparate Treatment as to Transfer and Suspension

#### 1. Standards of Proof under Title VII

Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment

practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In determining whether a complainant has made out a prima facie case under Title VII, district courts must apply the burden shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–57, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 505–12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997).

■ Plaintiff bears the initial burden of proving, by a fair preponderance of the credible evidence, a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. 1817; *Fisher v. Vassar College*, 114 F.3d at 1335. A plaintiff may demonstrate a prima facie case of employment discrimination by proving the four elements of the claim: (1) membership in a protected class; (2) qualification for the position; (3) discharge or other adverse employment action; and (4) circumstances giving rise to an inference of discrimination. *See Lapsley v. Columbia Univ.–College of Physicians*, 999 F.Supp. 506, 513 (S.D.N.Y.1998) (citing *Shumway v. United Parcel Service*, 118 F.3d 60, 63 (2d Cir.1997)); *de la Cruz v. New York City Human Resources Admin. Dep't Soc. Serv.*, 82 F.3d 16, 19 (2d Cir.1996). The Second Circuit has ruled that plaintiff's burden in establishing a prima facie case is minimal. *See Fisher v. Vassar College*, 114 F.3d at 1335; *St. Mary's Honor Center v. Hicks*, 509 U.S. at 506, 113 S.Ct. 2742; *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). In Title VII cases, "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089.

Once the plaintiff satisfies his or her burden of proving a prima facie case of discrimination, the burden then shifts to defendant to "[a]rticulate some legitimate, nondiscriminatory reason," for the employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. 1817. Defendant does not need to show that the articulated reason was the true motivation behind the decision, rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff." *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089. "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher*, 114 F.3d at 1334–36. Defendant can dispose of this burden of production by advancing admissible evidence in support of a nondiscriminatory basis for its actions. *See Burdine*, 450 U.S. at 255, 101 S.Ct. 1089; *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir.1995). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089.

If defendant articulates a nondiscriminatory reason for its actions, plaintiff must "[b]e afforded a fair opportunity to show that [defendant's] stated reason ... was in fact pretext," *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817, or, in other words, "[t]hat the presumptively valid reasons ... were in fact a coverup for a racially discriminatory decision." *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. 1817. At this stage of the inquiry, however, plaintiff must also satisfy the ultimate burden in the case, the burden of persuading the trier of fact that the defendant intentionally discriminated against plaintiff. *See Fisher*, 114 F.3d at 1336. Of course, at the summary judgment stage, plaintiff need not prove intentional discrimination, rather, "[p]laintiff may preclude summary judgment by producing evidence from which the trier of fact reasonably could draw an inference of dis-

crimination." *Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir.1989).

## 2. Plaintiff's Claims

In the present case, the first two elements of the prima facie case–plaintiff's membership in a protected class and plaintiff's qualifications for the positions he held–are not in dispute. The questions in this case involve the third and fourth elements of the prima facie case–an adverse employment action by defendants against plaintiff and proof of circumstances giving rise to an inference of discrimination.

### (a) Actionable Adverse Employment Decisions

As to the third element, plaintiff claims that the adverse employment decisions that he was subjected to were the reprimand, transfer, suspension and constructive discharge. An adverse employment decision is actionable under Title VII when it relates to an employee's "[c]ompensation, terms, conditions, or privileges of employment," or involves a classification which "[w]ould deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e-2(a). District courts in the Southern District of New York have found that to satisfy the third prong of the prima facie case, an employment decision must subject plaintiff to a " '[m]aterially adverse change in the terms or conditions of [his] employment[.]' " *Medwid v. Baker,* 752 F.Supp. 125, 136 (S.D.N.Y.1990) (internal quotations omitted). Certainly, an employment decision need not result in discharge to fall within the Title VII protection. As the Second Circuit has held, "[C]ongress did not intend to confine the scope of Title VII simply to instances of discrimination in pecuniary emoluments." *Rodriguez v. Board of Education,* 620 F.2d 362 (2d Cir. 1980).

Of the four alleged adverse actions claimed by plaintiff—the reprimand, transfer, suspension and constructive discharge–only plaintiff's transfer and suspension qualify as actionable adverse employment actions in satisfaction of the third element of the prima facie case.

█ With respect to the reprimand, plaintiff has failed to provide evidence to support a finding that the reprimand had a cognizable or material impact on the terms or conditions of his employment. The reprimand contained a warning that repetition of improper behavior could result in disciplinary action but contained no indication of any planned discipline or further action. Thus, a rational factfinder would have no basis for concluding that plaintiff suffered any actionable harm as a result of the reprimand.

█ As for the transfer, a factfinder could reasonably find that the transfer to the Safety Engineering Unit had a materially adverse impact on the terms of plaintiff's employment. According to a notation in plaintiff's April 29, 1993 performance evaluation, he was ineligible for any promotion opportunities while he was assigned to the SEU. Weiss Ex. 19. This change in plaintiff's promotion eligibility could reasonably be deemed to have had an adverse effect on plaintiff's employment status.

█ Based on the evidence produced by plaintiff, a factfinder could also logically find that the suspension constitutes an adverse employment action. Defendants suspended plaintiff for approximately six days without pay. Courts in this district have consistently found that suspensions of this sort impose a materially adverse impact on the terms and conditions of a plaintiff's employment. *See, e.g., Franklin v. Consolidated Edison Co. of New York,* 1999 WL 796170, at *9 (S.D.N.Y.); *Woods v. New York City Dept. of Sanitation,* 1999 WL 476305 (S.D.N.Y.); *Brown v. Middaugh,* 41 F.Supp.2d 172 (S.D.N.Y.1999). Thus, a jury would be justified in finding that the suspension constitutes an actionable employment action.

Plaintiff has failed to show, however, that he has suffered an adverse employment action as a result of a constructive

discharge. While it is true that the Second Circuit recognizes that constructive discharge qualifies as a "discharge" in satisfaction of the third prong of a prima facie case, *See Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360 (2d Cir.1993) ("A 'discharge,' in satisfaction of the third element of the prima facie case, may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge." *Id.*) (citing *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987); *Martin v. Citibank, N.A.,* 762 F.2d 212, 221 (2d Cir.1985)), plaintiff has not demonstrated that he was so discharged.

■ There are two key issues to address in determining whether an individual has been constructively discharged: (1) whether plaintiff's employers deliberately created unbearable working conditions for the purpose of forcing plaintiff to resign; and (2) whether a reasonable person in plaintiff's position would have felt compelled to resign. *See Stetson,* 995 F.2d at 361 ("To establish a 'constructive discharge,' a plaintiff must show that the employer 'deliberately ma[de his] working conditions so intolerable that [he was] forced into an involuntary resignation.)'" *Id.* (quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir.1983)(internal quotations omitted)); *Chertkova v. Connecticut General Life Insurance Co.,* 92 F.3d 81 (2d Cir.1996)("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit voluntarily." *Id.* at 89). The Second Circuit has strictly construed the standard for determining whether working conditions are intolerable, emphasizing that "[a] constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer," noting that the proper test is not "merely whether the employee's working conditions were difficult or unpleasant." *See Spence v. Maryland Casualty Co.,* 995 F.2d 1147, (2d Cir.1993). District courts must view the working conditions "as a whole," because "[a] reasonable person encounters life's circumstances cumulatively and not individually." *Chertkova,* 92 F.3d at 90.

■ Plaintiff alleges that he was constructively discharged because he was subjected to "racially abusive language," transfer, physical confrontation and suspension. Pl's Mem. Opp'n Summ. J. at 18. Taken together, these incidents do not amount to an intolerable working environment or evince an intent to force plaintiff to resign. The "racially abusive language" to which plaintiff refers is presumably Mr. Friedman's "boy" comment and Mr. Raykowski's "uppity nigger" comment. Two comments over the course of three years do not create an intolerable work environment. Furthermore, plaintiff's complaints of racial discrimination were taken seriously and were addressed by his employer. When plaintiff reported his complaints of racial discrimination to DOT's internal Equal Employment Opportunity Office ("EEO"), a full investigation was conducted on plaintiff's behalf and a formal report was issued. No action was taken, but this was because EEO found no evidence of discrimination. As for the transfer, while it may have made plaintiff unhappy, it did not create a difficult working environment for him. On the contrary, it moved him away from co-workers and supervisors who he had claimed were discriminating against him.

The confrontation involving Mr. Friedman and the resulting suspension might present a reasonable inference that plaintiff was constructively discharged if no fair hearing had been scheduled by DOT. The review process following the suspension was thorough and fair. An informal conference was scheduled to address the disciplinary charges arising from the July 13, 1993 dispute. The hearing was to be conducted by an Agency Representative from a completely separate office, the Office of Labor Relations. Plaintiff was given the

opportunity to appear at the conference represented by counsel. After the conference, the Agency Representative was required to issue a written decision, which plaintiff had the option of appealing. If plaintiff wanted to appeal, he had the right to request a more formal hearing in accordance with his union contract. At the union hearing, plaintiff would have been afforded the opportunity to appear, be represented by counsel, summons witnesses to testify on his behalf, present evidence and to cross-examine any witnesses testifying against him. Plaintiff had notice of all of this. He retained counsel but resigned on the date of the informal conference, requesting that the conference be canceled. Perhaps a rational jury could find that Friedman's actions were directed towards forcing plaintiff to resign and that plaintiff felt compelled to leave if the suspension and disciplinary charges were the final word on plaintiff's employment status or if no fair hearing was scheduled to address the charges plaintiff faced. However, in light of the fair hearing and opportunity to be heard before an independent arbiter, a rational jury could not plausibly find that a reasonable person in plaintiff's situation would have felt compelled to resign.

Treating plaintiff's complaints cumulatively and viewing the working conditions as a whole, this court finds that plaintiff has not presented sufficient evidence from which a rational jury could infer either that his employers intentionally created an intolerable working environment or that a reasonable person in plaintiff's shoes would have felt compelled to resign. To the extent that Friedman's actions created a difficult work environment for plaintiff, DOT afforded plaintiff a fair opportunity to be heard. It was plaintiff who chose not to accept this opportunity and instead voluntarily resigned.

#### (b) Circumstances Giving Rise to an Inference of Discrimination

The only remaining question regarding plaintiff's prima facie case is whether the adverse actions–the transfer and suspension–occurred in circumstances giving rise to an inference of discrimination. The proper inquiry in determining whether plaintiff has supported such an inference is "[w]hether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." *See Bickerstaff v. Vassar College,* 196 F.3d 435 (2d Cir.1999). The court finds that plaintiff has not met his burden on this motion.

With respect to the transfer, plaintiff has not presented a claim that would give rise to an inference of racial discrimination separate from his retaliation claim. While it is completely possible that the transfer was instituted in retaliation for his formal complaints, plaintiff has not presented any evidence of racial discrimination aside from this claim discussed below. Since plaintiff has properly pleaded a claim for retaliation, this issue should be addressed separately from the disparate treatment claims. Plaintiff has failed to present evidence to support an inference of racial discrimination in the disparate treatment context as it relates to his transfer.

■ As for his suspension claim, the evidence presented does not support a logical inference of discrimination under all of the circumstances. Looking at all the evidence in this case, plaintiff has proffered no evidence which would lead a reasonable jury to conclude that racial discrimination was an element in his suspension. Regardless of the race of an employee, if he is accused of physically confronting his supervisor, the employer is likely to take immediate action against the him. As mentioned above with respect to constructive discharge, if plaintiff had not been afforded the right to a fair hearing, an inference of discrimination might reasonably arise in this situation also. However, an examination of all of the circumstances surrounding the suspension, and the other evidence in this case, does not yield a logical inference of racial discrimination as an element in plaintiff's discharge. Assuming plaintiff's account of the episode is true, the supervisor did indeed behave im-

properly, and plaintiff's suspension may have been unwarranted. However, plaintiff had the opportunity to present his side of the story in the scheduled disciplinary hearing. It is impossible to know whether the hearing could have actually remedied the situation or addressed the supervisor's misconduct because plaintiff chose not to participate in the process. Nonetheless, the fact that a fair hearing was scheduled to address the situation prevents any reasonable inferences of discrimination from arising in connection with plaintiff's suspension.

Because plaintiff has not presented evidence in support of a reasonable finding that the employment actions took place in circumstances giving rise to an inference of discrimination, the court finds that plaintiff has failed to demonstrate a prima facie case of disparate treatment as to either his transfer or suspension claims.

### C. Hostile Work Environment

The Supreme Court has held that Title VII extends to hostile work environment complaints in *Harris v. Forklift Systems Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In order to prevail under a hostile work environment claim, a plaintiff must establish that "[t]he workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998). The court must consider the totality of the circumstances in assessing whether the plaintiff has a viable hostile work environment claim. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title

VII's purview." *Harris*, 510 U.S. at 20, 114 S.Ct. 367.

In the instant case, plaintiff points to seven incidents in support of his claim that his workplace was a hostile environment: (1) Mr. Matarangelo told plaintiff he was "different than other minorities in the office;" (2) Mr. Matarangelo referred to black youths as "animals" in a conversation about killings at a concert; (3) Mr. Matarangelo repeatedly referred to Mayor David Dinkins as a "washroom attendant;" (4) Mr. Raykowski called plaintiff an "uppity nigger;" (5) an anonymous note was left on his desk saying "dump the dink;" (6) a black doll was hung on a doorframe near plaintiff's workstation; and (7) Mr. Friedman called him "boy."

As to the complaints about Matarangelo's comments, the anonymous doll hanging and "dump the dink" note, the plaintiff has not shown that these were anything more than offensive comments. "[M]ere utterance of an ... epithet which engenders offensive feelings in an employee ... does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 20, 114 S.Ct. 367 (internal quotations omitted). On the contrary, "uppity nigger" and "boy" statements legitimately evince racial hostility.

■ Overall, seven instances over three years does not create a work environment permeated with racial hostility. *See Carter v. Cornell University*, 976 F.Supp. 224, 232, aff'd. 159 F.3d 1345 (2d Cir.1998) (finding that six comments over three years did not constitute a hostile or abusive work environment). Plaintiff has simply failed to present evidence to support a finding that his workplace was objectively abusive and hostile.

### D. Retaliation

■ To establish a prima facie claim of retaliation, plaintiff must prove (1) plaintiff filed a good faith complaint of discrimination; (2) that the employer had knowledge of; (3) the employer took adverse employ-

ment action against plaintiff; and (3) there existed a causal connection between plaintiff's protected activity and defendant's action. *See Sumner v. United States Postal Service*, 899 F.2d 203, 208 (2d Cir.1990). The analysis in retaliation cases follows the McDonnell Douglas burden shifting. *See Sumner*, 899 F.2d at 208.

Plaintiff claims that his transfer and suspension were instituted in retaliation for his discrimination complaints. The parties do not dispute the first two elements of the claim–plaintiff's filing of a good faith complaint and defendants' knowledge of the complaint. As for the third element, adverse employment action, the court has found that both the transfer and the suspension constitute adverse employment decisions. Thus, the only issue remaining is whether a causal connection existed between the employment actions and plaintiff's employment discrimination complaint. Plaintiff has demonstrated a causal connection with respect to the transfer, but not the suspension.

█ Plaintiff has failed to support a finding that a causal connection existed in relation to his suspension. Plaintiff has not produced any evidence to connect his discrimination complaints to his suspension. Beyond plaintiff's "unsupported assertions," a rational factfinder would have no evidentiary basis for justifying a finding that a causal connection exists between plaintiff's complaint and his suspension. *See Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995) (stating that in a summary judgment case, "[p]laintiff cannot meet [his] burden through reliance on unsupported assertions." *Id.*) Therefore, plaintiff has not presented a viable claim for retaliation regarding his suspension.

As to plaintiff's transfer, plaintiff has, at the very least, presented a genuine issue of material fact as to whether the transfer was motivated by his formal discrimination complaints. For one, the Employee Relations Office notified plaintiff of the potential transfer approximately one month after the second discrimination complaint

was filed. Plaintiff was, in fact, temporarily reassigned one month later. Additionally, the memoranda stating the reasons for the transfer indicated that plaintiff was being transferred pending final resolution of the discrimination investigation. Based on these facts, a factfinder could logically conclude that defendant transferred plaintiff in retaliation for plaintiff's formal complaints.

Once plaintiff establishes a prima facie case, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for transferring plaintiff. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. In satisfaction of this burden, defendant claims that the reason for the transfer was plaintiff's disruptive behavior and the rising tensions at PCU. Def.'s Mem. Supp. Summ. J. at 13–14; Weiss Ex. 16. These explanations suffice in meeting defendant's burden of articulation.

█ If defendants articulate a nondiscriminatory reason, plaintiff must present evidence to support a finding that 1) defendants' reasons are pretextual and 2) that defendants were actually motivated by racial discrimination. Plaintiff has failed to do so. As stated above, the transfer memoranda and the timing of the transfer present a genuine issue of fact as to whether defendant was acting with a retaliatory motive. However, the court finds that the plaintiff has not made out a viable claim of retaliation as it relates to his transfer. He has presented no evidence from which a jury could reasonably conclude that defendants' reasons were pretext and that race discrimination played a role in his transfer.

### III. CONCLUSION

For the reasons articulated above, the court now grants summary judgment to defendants as to plaintiff's disparate treatment, hostile work environment, constructive discharge and retaliation claims.