**Alice HONEY, Plaintiff,**

v.

**COUNTY OF ROCKLAND, Defendant.**

No. 01CIV.1686(CM)(MDF).

United States District Court,
S.D. New York.

April 16, 2002.

Timothy Connick, CSEA Legal Department, Albany, NY, for Plaintiff.

Charlotte G. Swift, Jason & Nesson, L.L.P., for Defendant.

MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff commenced this action against her employer, County of Rockland, for allegedly retaliating against her for her filing of a complaint alleging disability discrimination with the EEOC on April 18, 1996. Plaintiff alleges that as a direct result of her complaint with the EEOC, defendant took an adverse employment action against her, including "refusing to allow plaintiff to 'swap' her work shift with other employees, ongoing harassment, reprimand, and other hostile treatment" in violation of the Americans with Disabilities Act ("ADA"). Complaint ¶ 14. Defendant moves for summary judgment pursuant to Fed.R.Civ.P. 56.

### FACTS PERTINENT TO THE MOTION

I. *Actions leading up to filing of EEOC Complaint*

Plaintiff Alice Honey became a Radio Operator I for the defendant Rockland County in 1988. Honey Aff. ¶ 4. Radio Operators are the 9-1-1 operators for Rockland County. Plaintiff's job included receiving and transmitting police, fire and other emergency information by telephone, radio and state and national computer systems, assisting in the radio coordination of all emergency services in the County, and monitoring and maintaining many automatic fire alarm accounts. Def. 56.1 ¶ 10. According to the job description, a Radio Operator I must work "one shift of an operation that covers 24 hours, 7 days a week." Def. 56.1 ¶ 11, Ex. 6. A Radio Operator I employee would be assigned to one of three work shifts assigned on a

weekly basis. The three shifts consisted of a 12:00 A.M.—8:00 A.M. shift, a 8:00 A.M.—4:00 P.M. shift, and a 4:00 P.M.—12:00 A.M. shift. Pl. 56.1 ¶ 13. From 1988 to late 1995, plaintiff worked this rotation shift schedule without problem or complaint. Honey Aff. ¶ 4. In 1995, Chief Joseph Britney was plaintiff's direct supervisor.

In 1995, plaintiff started to experience chest pain and dizziness. In late October/early November of 1995, plaintiff was hospitalized for medical tests. Pl. Aff. ¶ 5. Although the tests showed no signs of a heart attack or any other serious cardiac illness, plaintiff's doctor informed her that she should not be working frequent rotating shift because it aggravated her health problems. Pl. Aff. ¶ 6. Plaintiff presented Chief Britney with a letter from her physician stating that plaintiff's shifts should be changed no more than once a month, rather than on a weekly basis. Def. 56.1 ¶ 68. Plaintiff's doctor subsequently filled out a Medical Assessment Form, in which the doctor stated that the frequent changes in plaintiff's shifts were causing "sleeping difficulties" and "added weight gain," and therefore should only be made once a month. Def. 56.1 ¶ 73, Ex. 14. The doctor did note, however, that plaintiff was capable of working full-time and performing all activities normally. *Id.* at ¶ 72.

In December 1995, Chief Britney suggested that, if it was agreeable to the person who was working the 8:00 A.M. to 4:00 P.M. shift when plaintiff was assigned to the 12:00 A.M. to 8:00 A.M. shift, plaintiff could switch her shift with that person for two months beginning in January 1996. Def. 56.1 ¶ 79, Ex. 5 at 85 and Ex. 12; Pl. Aff. ¶ 10. In January 1996, plaintiff began switching shifts with Radio Operator I Brian Block pursuant to this discussion. Def. 56.1 ¶ 81; Pl. Aff. ¶ 11. This arrangement did not provide plaintiff with a single shift schedule—she still had to rotate between the 8:00 A.M.—4:00 P.M. shift and the 4:00 P.M.—12:00 P.M. shift. Plaintiff did not attempt to switch her 4:00 P.M.—12:00 P.M. shift. Def. 56.1 ¶ 85.

On or about February 15, 1996, Chief Britney gave plaintiff a letter that stated:

This is to re-affirm our conversation of December 21, 1995 concerning your Doctors [sic] note suggesting you change shifts on a monthly basis. As a result we agreed that you could "mutually swap" your 12 to 8 shifts with Brian Block's 8 to 4 shifts, for January and February 1996.

Consequently, commencing March 2, 1996 I anticipate your return to your normally assigned 12 to 8 shifts.

Def. 56.1 ¶ 93, Ex. 19. After giving plaintiff the letter, Chief Britney had a conversation with plaintiff. Plaintiff asserts that Chief Britney gave her permission to continue swapping her midnight shifts occasionally if her and Mr. Block's schedules were identical and the switch did not cost any money, but stated that he no longer approved of the switch arrangement and would no longer sanction it. Honey Dep. pp. 101–104. A permanent change to her shift schedule was not discussed at that time. Def. 56.1 ¶ 96.

On February 22, 1996, plaintiff brought Chief Britney a letter from her physician which stated that plaintiff suffered from "HTN [hypertension] and obesity" and that she should not change shifts more than once a month. Def. 56.1 ¶ 98, Ex. 20; Pl. Aff. ¶ 16. On February 23, 1996, plaintiff contacted her union representative about the end of her sanctioned shift arrangement. Def. 56.1 ¶ 98. Plaintiff's union representative told her to write a letter telling the Chief that she was applying for accommodations through the ADA. *Id.*

On February 29, 1996, plaintiff gave the chief a letter which stated that "based

upon my health as documented by my physician ... I am applying for accommodations through the ADA." Def. 56.1 ¶ 99, Ex. 21. Plaintiff also gave the Chief another copy of her physician's note. On or about March 19, 1996, Chief Britney contacted plaintiff and reiterated that he expected her to work her regular schedule. Def. 56.1 ¶ 105, Ex. 12. Between February 15, 1996 and through the middle of April 1996, plaintiff and Brian Block continued to switch his morning shift for her midnight shifts. Plaintiff claims that after she gave her February 29, 1996 letter to Chief Britney, he "essentially stopped talking to me and was generally rude and offensive in his dealings with me." Pl. Aff. ¶ 17.

On or about April 10, 1996, plaintiff wrote a letter to Chief Britney in which she requested "reasonable accommodations" of her "disability." Plaintiff listed three possible "accommodations": (1) rotation of shifts not more than once a month; (2) a steady day shift; (3) a steady day shift "during the busiest times of the day". Def. 56.1 ¶ 116, Ex. 23. It is undisputed that since plaintiff began working for the County in 1988, no Radio Operator I has ever worked a steady day shift, has ever worked a shift where he or she rotated shifts only once a month or has ever been given steady day shifts as requested by plaintiff. Def. 56.1 ¶¶ 117–119. In fact, no Radio Operator I, prior to a negotiated change in the schedule for all Radio Operators I in the fall of 2000, ever had a steady single shift assignment since 1988. Id. at ¶ 120.

On April 11, 1996, Chief Britney responded to plaintiff's letter. His letter stated that he had passed plaintiff's inquiry on to the Rockland County Attorney's Office for an opinion, and that Chief Britney would respond to plaintiff as soon as possible after the attorney assigned to the case returned from vacation on April 15, 1996. Def. 56.1 ¶ 123, Ex. 24. On April 15, 1996, plaintiff's request for a change in her work schedule was denied. Id. at ¶ 124, Ex. 25. Chief Britney, in a letter to plaintiff, stated that the County did not believe that plaintiff suffered from a disability as defined by the ADA, that her request for an exemption from working her regular shift rotations was denied, and that because her physician has said that she suffered from symptoms which made it potentially dangerous for plaintiff to do her job, the County would seek to have plaintiff examined by a physician to determine her fitness pursuant to Civil Service Law § 72. Id. at ¶ 125, Ex. 25.

## II. *Filing of the EEOC Complaints and this Action*

On or about April 19, 1996, plaintiff filed a disability discrimination complaint with the EEOC. Def. 56.1 ¶ 128, Ex. 3. On April 30, Chief Britney received a copy of this complaint from the EEOC. Def. 56.1 ¶ 131; Pl. Aff. ¶ 25. In plaintiff's discrimination complaint with the EEOC, she charged that the County discriminated against her because of her obesity and hypertension, which she described as "disabilities". She described the discrimination against her as the County's refusal to create a new schedule whereby she would rotate shifts only once a month. The EEOC eventually dismissed plaintiff's disability discrimination claim on November 24, 1997, finding no probable cause to believe there was a violation of the ADA. Def. 56.1 ¶ 167.

On June 11, 1996, plaintiff filed a second complaint, this time of retaliation, with the EEOC. Def. 56.1 ¶ 146, Ex. 4. In her retaliation complaint, plaintiff stated that the County had retaliated against her for filing her April 18, 1996 disability discrimination complaint. Id. at ¶ 147. In her Charge of Discrimination, plaintiff stated:

From December 11, 1995 until May 16, 1996, my co-worker and I have continuously swapped our midnight and day shifts. On May 16, 1996, I was informed that I could no longer switch with my co-worker because of my "pending litigation."

Def. 56.1 Ex. 4. On March 3, 1998, the EEOC sent a determination letter to both parties stating that there was reason to believe that a retaliatory act had occurred. On December 14, 2000, the Department of Justice ("DOJ") sent a letter to plaintiff stating that the DOJ had determined not to file suit, but that plaintiff had the right to sue defendant. She brought this action a little over two months later.

### III. The Alleged Retaliatory Acts

In this action, plaintiff alleges several retaliatory acts that form the basis of her complaint.

#### A. Prohibition of shift swaps

Plaintiff alleges that after she filed the April 18, 1996 EEOC complaint, Chief Britney forbade any and all shift swaps. Defendant contends that the Chief told plaintiff that she should no longer switch shifts after February 15, 1996, but she continued to do so. Defendant contends that Chief Britney had told plaintiff that she was to stop swapping her midnight shifts with Brian Block on February 21, March 19, April 2 and April 15, Def. 56.1 ¶ 133, all before she ever filed an EEOC complaint.

Plaintiff testified at her deposition that she submitted a note to Chief Britney in late April/early May 1996 requesting permission to swap a week of midnight shifts with Brian Block on May 2—May 6. Def. 56.1 ¶ 134; Ex. 5, T. 133. This note has never been produced. Def. 56.1 ¶ 134. Plaintiff asserts that on or about May 16, 1996, during a 4:00 P.M.—12:00 P.M. shift,

Chief Britney entered the Radio Room (where she worked), handed her back this note and stated "Pending litigation, this and all further requests are hereby denied." Id.; P. Aff. ¶ 26. Plaintiff first asserted that this statement was definitely made on May 16, 1996, and stated that she was certain that Keith Mahoney, another Radio Operator I, was on duty with her that night. Pl. Aff. ¶ 27. In her Affidavit in Opposition to Defendant's Motion for Summary Judgment, she now alleges that this statement may have been made on May 15, 16 or 17. Id. at ¶ 28. According to the County's personnel records, Keith Mahoney did not work any of those evening shifts. Def. 56.1 ¶¶ 129, 138, 145. Plaintiff interpreted the statement that Chief Britney allegedly made as a prohibition on all swaps—daily swaps or weekly swaps. Pl. Aff. ¶ 26. At her deposition, however, plaintiff testified that sometime after May 16, 1996, she did request and was granted a daily shift swap. Def. 56.1 ¶ 165, Ex. 5, T. 182–183.

Plaintiff still works as a Radio Operator I. On September 28, 2000, Rockland County offered plaintiff a Radio Operator I position wherein she could work a steady, non-rotating work shift on a permanent basis, except in emergencies. Plaintiff turned down the offer, and chose, instead, to continue working a rotating shift schedule that requires her to change shifts every week. Plaintiff continued to work rotating shifts as of October 2001 when defendant's motion for summary judgment was filed.

#### B. Reprimand letter

On February 22, 1997, Sgt. John Campbell of the Haverstraw Town Police pulled over a driver and radioed plaintiff for a license and registration check. Plaintiff received the transmission, but never returned the information to the officer. Sgt.

Campbell was compelled to release the motorist because plaintiff did not respond with any information after ten minutes. He later discovered that the driver he released was operating the vehicle while his driver's license was suspended—a misdemeanor. The Sergeant later asked plaintiff to fax the information she obtained to his headquarters before the end of his shift "for follow up and further action." Plaintiff did not respond to any of his requests. Def. 56.1 Ex. 36. Sgt. Campbell filed a verbal complaint about this matter.

On March 3, 1997, Chief Britney notified plaintiff that he had received a complaint from an outside agency and that he wanted to meet with her concerning the complaint on March 6, 1997. Def. 56.1 ¶ 152. On March 5, 1997, plaintiff asked Chief Britney who she should call to get a union representative for the meeting. Chief Britney gave plaintiff two phone numbers for union representatives. Def. 56.1 ¶ 153, Ex. 37. Chief Britney later received a phone call from Caroline Osinga, a union representative. Ms. Osinga asked if the March 6, 1996 meeting could be postponed. The Chief agreed to a postponement, and the meeting was held on March 7, 1997. Chief Britney, Supervisor Adam Feuer, plaintiff and Ms. Osinga attended the meeting. Def. 56.1 ¶ 154.

After the meeting, Sgt. Campbell placed his verbal complaint in writing. Def. 56.1 ¶ 155, Ex. 36. On March 17, 1997, Chief Britney placed a letter of reprimand in plaintiff's file. Plaintiff refused to sign for receipt of the letter, and this refusal was witnessed by Supervisor Feuer. Plaintiff also declined to listen to the audiotapes of the February 22, 1997 incident or to review the letter from Sgt. Campbell. Def. 56.1 ¶ 156, Ex. 39. Plaintiff filed a complaint against Chief Britney with the Rockland County Office of Employee Rights on March 24, 1997, in which she claimed that the reprimand was an act of retaliation for her filing of the EEOC disability discrimination complaint the year before, and that by reprimanding her for the incident, Chief Britney had created a "hostile work environment" for her. Def. 56.1 ¶ 157. The county dismissed the complaint. *Id.*

On November 22, 1999, Chief Britney gave plaintiff and Operator Gregory Dunn a letter of reprimand for paging the Rockland County Executive at 5:30 A.M. without good reason, and in non-compliance with standard operating procedures. Def. 56.1 ¶ 168, Ex. 43.

### C. Requests for Medical Examinations

Plaintiff also claims that the County's two requests for plaintiff to undergo medical testing were acts of retaliation. In June 1996, Chief Britney forwarded the February 29, 1996 letter from plaintiff's physician to the Commissioner of Personnel of Rockland County's Sheriff's Office. Pl. Aff. ¶ 30, Ex. F. The physician's letter stated that plaintiff could not work frequent change shifts because of her health. Also attached to Chief Britney's letter was a recent complaint by plaintiff of some of the working conditions at the office. In his letter to the Commissioner, Chief Britney suggested that "in light of the latest issue I should respectfully request that Mrs. Honey be referred to an appropriate medical professional." *Id.* It is not clear if plaintiff was even asked to see a medical professional as a result of this note.

On December 10, 1996, Chief Britney sent plaintiff a letter formally requesting that she undergo a medical evaluation "as a consequence of [her] prior attendance record, self-stated concerns about [her] ability to perform and [her] doctor's letter [from February 1996]" in order to "determine if [she] should be placed upon a leave of absence for ordinary disability." Pl.

Aff. ¶ 31, Ex. G. Plaintiff never had this medical examination.

Plaintiff contends that these requests for medical examinations were retaliatory acts against her because of her filing of her EEOC complaint of disability discrimination.[1]

### D. *Unfriendly Environment*

Plaintiff contends that her "job conditions were hell" after she filed her EEOC charge. Pl. Aff. ¶ 33. She was "constantly in fear [she] would be disciplined, [ ] was treated shabbily, [ ] was threatened with medical examinations, and generally made miserable." *Id.* She felt "extremely upset, anxious and unwell." *Id.* Plaintiff further contends that Chief Britney ignored her and was not as friendly to her as he was before she filed her charges.

### IV. *This Action*

On February 26, 2001, plaintiff filed this action, alleging retaliation for the filing of an EEOC charge in violation of the ADA. On October 9, 2001, defendant filed its motion for summary judgment.

### DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348 (citation omitted). The nonmoving party "must present 'concrete particulars' and cannot succeed with purely conclusory allegations." *Fitch v. R.J. Reynolds Tobacco Co.,* 675 F.Supp. 133, 136 (S.D.N.Y.1987) (citation omitted). There is no issues for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. As the Court held in *Anderson,* "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

### II. *Plaintiff's ADA Retaliation Claim*

### A. *Applicable Law*

The ADA prohibits, *inter alia,* retaliation against any individual who has asserted rights under the ADA:

> No person shall discriminate against any individual because such individual . . . made a charge, testified, assisted, or participated in any manner in an investi-

---

**1.** The County requested that plaintiff undergo a medical evaluation in April 1996, but plaintiff does not argue that this was an adverse employment action, presumably because it occurred before she engaged in her protected activity.

gation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

■ This provision is substantially similar to the retaliation prohibition in Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–3(a) (1994) ("[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII). This Circuit has held that it is appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation under the ADA. *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999); *see also Accord Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1328 (11th Cir.1998); *Barnett v. U.S. Air Inc.*, 157 F.3d 744, 753 (9th Cir.1998); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir.1998); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).

■ To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action. *See generally Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2d Cir.1996), cert. denied, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993).

■ If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. If such a reason is proffered, the burden then shifts back to the plaintiff to prove the ultimate issue—whether "retaliation 'played a motivating role in, or contributed to, the employer's decision.' " *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir.2000) (quoting *Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 222 (2d Cir.1997)).

Here, plaintiff has established the first two prongs of her prima facie case—filing an EEOC complaint is a protected activity and the County knew of the filing.

### B. *Adverse Employment Action*

■ A plaintiff sustains an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment. *See Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) (relying on *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)); *see also Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000). To be "materially adverse" a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady*, 993 F.2d at 136. "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.; see also Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997).

#### 1. *Prohibition on weekly shift swaps*

■ Plaintiff contends that Chief Britney prohibited her from swapping any shifts in mid-May 1996, a few weeks after she filed her EEOC discrimination com-

plaint. Plaintiff alleges that this refusal to make a reasonable accommodation for her disability constituted an adverse employment action that was causally related to her EEOC complaint.

Plaintiff alleges that shortly after she filed her EEOC complaint, Chief Britney informed her that, "pending litigation," all of her requests to switch her midnight shifts would be denied. Plaintiff first contended that Chief Britney made this statement on May 15, 16 or 17 1996. Plaintiff also asserted that Operator Keith Mahoney was working with her when the Chief made this statement to her. According to employee records and to Mr. Mahoney's own testimony, Mahoney did not work May 15, 16 or 17, or any days immediately preceding or following those days. Chief Britney denies making this statement. However, drawing all reasonable inferences in favor of the non-moving party, there is a question of fact as to whether this exchange occurred.[2]

■ If the above exchange did occur, and Chief Britney did refuse to accommodate plaintiff's disability as he had for the past four months, such a refusal does constitute an adverse employment action. From January 1996 until the date she filed her EEOC complaint, plaintiff alleges that defendant at least partially accommodated her disability by approving her midnight shift swaps with Brian Block. Yet, only a few weeks after she filed her complaint, plaintiff contends that defendant refused to accommodate her disability at all, and linked that refusal to the pendency of litigation. This close proximity in time between the protected activity and the adverse employment action leads to an inference of causation necessary to establish plaintiff's prima facie case of retaliation. *See Manoharan v. Columbia*

*University College of Surgeons and Physicians,* 842 F.2d 590, 593 (1988).

Summary judgment is particularly inappropriate where, as in most employment discrimination cases, an employer's intent and motivation are in issue. *Gallo v. Prudential Res. Services,* 22 F.3d 1219, 1223 (2d Cir.1994); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1988). Whether Chief Britney's refusal to allow plaintiff to switch her midnight shifts any longer was fueled by retaliatory intent rests solely on Chief Britney's and the County's intent and motivation. Such a determination can not be made at the summary judgment level in this instance. Therefore, defendant's motion for summary judgment must be denied.

### 2. *Reprimand letters*

■ Plaintiff's other allegations of retaliatory actions do not constitute adverse employment actions, as defined by the ADA.

Chief Britney's placement of two reprimand letters in plaintiff's employment file, one a year after she filed her charge and another three years after she filed her charge, is not an adverse employment action.

■ A reprimand can constitute an adverse employment action. *Phillips v. Bowen,* 278 F.3d at 109. However, courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation. *See Carter v. New York City Dep't of Corrections,* 7 Fed. Appx. 99, 103, 2001 WL 345170, at *3 (2d Cir. Apr.5, 2001); *Yerdon v. Henry,* 91 F.3d 370, 378 (2d Cir.1996) (filing of charges against employee that were not

**2.** Whether this fact undermines plaintiff's credibility is a question for a jury to decide.

adjudicated did not constitute retaliation). *See also Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y.2001) (alleged excessive scrutiny which resulted in reprimands did not constitute adverse employment action absent any other negative results); *Stembridge v. City of New York*, 88 F.Supp.2d 276 (S.D.N.Y.2000) (no actionable harm where "reprimand contained a warning that repetition of improper behavior could result in disciplinary action but contained no indication of any planned discipline or further action"); *Slinkosky v. Buffalo Sewer Authority*, 97 Civ. 0677E(SR), 2000 WL 914118, at *8 (W.D.N.Y. June 29, 2000) (noting that failure to remove a letter of reprimand from an employee's file was not an adverse employment action because plaintiff failed to show that the reprimand affected her compensation, promotion opportunities, or any other term, privilege or condition of her employment).

The two reprimand letters placed in plaintiff's file one year and three years after she had filed her EEOC complaint did not materially change her employment conditions—she was not fired, her pay was not docked, no work privileges were withheld. "Although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." *Henriquez v. Times Herald Record*, No. 97 Civ. 6176, 1997 WL 732444, at *5 (S.D.N.Y. Nov.25, 1997), *aff'd*, 165 F.3d 14, 1998 WL 781781 (2d Cir.1998). Furthermore, there is no causal time nexus between the alleged protected activity and the reprimand letters; whereas close proximity in time between a protected activity and an adverse employment action can give rise to an inference of causation, "[c]onversely, causation is less likely if there is a long hiatus between the protected activity and the [adverse action]."

*Lapsley v. Columbia University—College of Physicians and Surgeons*, 999 F.Supp. 506, 525 (S.D.N.Y.1998) (internal citations omitted).

### 3. Requests for medical examinations

■ Chief Britney's request that plaintiff undergo a medical examination to ascertain her fitness to work all three shifts as required by her job description was not an adverse employment action. The requests did not materially change plaintiff's working conditions. In fact, plaintiff ignored the request, and no further requests for a medical evaluation were ever made.

### 4. Unfriendly Environment

■ Plaintiff's allegation that Chief Britney became increasingly rude to her, and ignored her, and that she was anxious and unwell at work, is also inadequate to establish an adverse employment action. The Second Circuit has held that "a merely discourteous working environment does not rise to the level of First Amendment retaliation." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir.2002). *See also Wannamaker*, 108 F.3d at 466 (mere workplace annoyances without more, such as a loss of status, a clouding of job responsibilities, or a diminution in authority, do not constitute adverse employment actions) (citing *Collins v. State of Illinois*, 830 F.2d 692, 704 (7th Cir.1987)). The fact that Chief Britney did not engage plaintiff in conversation, and only addressed her if she first addressed him, does not constitute an adverse employment action. Furthermore, plaintiff herself admits that Chief Britney began to ignore her months before she engaged in her protected activity of filing an EEOC complaint, so no causal connection between the adverse employment action and the protected activity can be made.

Viewing the facts in a light most favorable to the non-moving party, plaintiff successfully alleges a prima facie case of retaliation insofar as defendant's failure to provide her a reasonable accommodation for her purported disability weeks after she filed a complaint of disability discrimination with the EEOC. Plaintiff's claim of retaliation may be based only on defendant's alleged failure to provide her with a reasonable accommodation; the reprimand letters, requests for a medical evaluation and general unfriendliness of Chief Britney towards her can not constitute adverse employment actions sufficient to establish a prima facie case of retaliation. None of these alleged retaliatory actions were in any way disadvantageous to her career, resulted in a loss of pay or changed her job responsibilities.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted in part and denied in part.